RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0052P (6th Cir.)
File Name: 04a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 02-6076

ELVIS A. GARRIDO-SANTANA,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 97-20204—Samuel H. Mays, Jr., District Judge.

Argued: December 5, 2003

Decided and Filed: February 20, 2004

Before: KENNEDY, MARTIN, and MOORE, Circuit
Judges.

———————

## COUNSEL

**ARGUED:** Needum L. Germany, OFFICE OF THE
FEDERAL PUBLIC DEFENDER FOR THE WESTERN
DISTRICT OF TENNESSEE, Memphis, Tennessee, for
Appellant. Thomas A. Colthurst, ASSISTANT UNITED
STATES ATTORNEY, Memphis, Tennessee, for Appellee.
**ON BRIEF:** Doris A. Randle-Holt, Stephen B. Shankman,

OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR
THE WESTERN DISTRICT OF TENNESSEE, Memphis,
Tennessee, for Appellant. Thomas A. Colthurst,
ASSISTANT UNITED STATES ATTORNEY, Memphis,
Tennessee, for Appellee.

———————

## OPINION

———————

KENNEDY, Circuit Judge. Defendant Elvis Garrido-
Santana entered a conditional plea of guilty to one count of
possessing cocaine with the intent to distribute in violation of
21 U.S.C. § 841(a) (1). Defendant appeals the district court's
denial of his motion to suppress evidence. Defendant also
appeals the district court's application of a sentence
enhancement for obstruction of justice under United States
Sentencing Guidelines ("U.S.S.G.") § 3C1.1 and its denial of
a sentence reduction for acceptance of responsibility under
U.S.S.G. § 3E1.1. For the reasons explained below, we
AFFIRM the denial of defendant's suppression motion and
his sentence.

## I. Background

Defendant Garrido-Santana was indicted on one count of
possessing cocaine with the intent to distribute in violation of
21 U.S.C. § 841(a) (1). Defendant failed to appear for his
arraignment on that charge after being released on bond.
Based upon this failure to appear, the government secured a
superseding indictment that added a second count charging
defendant with violating 18 U.S.C. § 3146(a)(1). Defendant
was ultimately arraigned upon being extradited from the
Dominican Republic, the country to which he fled. Defendant
filed a motion to suppress evidence flowing from police
officers' traffic stop of the rental vehicle that defendant was
driving. After conducting an evidentiary hearing, the
magistrate judge, to whom the district court had referred

defendant's suppression motion, issued a report and recommendation advising the district court to deny that motion. Adopting the magistrate judge's proposed findings and recommendation, the district court denied defendant's suppression motion. Defendant entered a conditional plea of guilty to count one of possessing cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a) (1), expressly reserving his right to appeal the denial of his suppression motion. The district court, pursuant to the government's motion, dismissed count two charging defendant with failing to appear at his arraignment. However, in sentencing defendant on count one, the district court relied on this failure to appear in enhancing defendant's sentence by two levels under U.S.S.G. § 3C1.1 for obstruction of justice and in refusing to reduce defendant's sentence under U.S.S.G. § 3E1.1 for acceptance of responsibility. After applying all of the relevant factors, the district court ultimately arrived at a Guidelines' range in which it sentenced defendant to ninety-seven months of imprisonment followed by three years of supervised release.

## II. Defendant's Suppression Motion

### A. Relevant Facts

In denying the suppression motion, the district court found the following facts. On the morning of September 18, 1997, Patrolman Terry M. Lomax ("Lomax") of the Shelby County Sheriff's Department was parked in a marked squad car in the grassy median strip of Interstate 40 in Shelby County, Tennessee. When a 1997 Chrysler LHS sedan–the vehicle that defendant was driving–passed his position, Lomax pointed his radar speed-clocking unit at the sedan. Yet, the radar picked up only a large tractor-trailer that was traveling in the east-bound lane adjacent to the sedan; it indicated that the tractor-trailer was proceeding at the posted speed limit of 65 mph. After the sedan passed the tractor-trailer, Lomax pulled his vehicle out of the median and pulled alongside the sedan. As he testified, Lomax did not know whether the

tractor-trailer had maintained the posted speed or had slowed down. Lomax's accurately-calibrated speedometer and radar "clocked" the sedan at 71 mph. Activating his squad car lights, Lomax pulled the sedan over for speeding.

Upon approaching the driver's side door of the sedan, Lomax asked defendant, who was traveling alone, for his driver's license. Defendant handed Lomax a Puerto Rico driver's license in the name of "Elvis A. Garrido." Examining the license, Lomax found it to be valid and current. Lomax informed defendant that he had stopped him for speeding. Lomax then inquired about defendant's place of departure and destination. Defendant replied that he had come from Houston, Texas, and was heading to New York to visit his mother. Asked if he lived in Puerto Rico, defendant answered in the affirmative. Lomax testified that he was suspicious of the fact that defendant, a resident of Puerto Rico, was driving a car with Texas plates. After Lomax asked about the vehicle's ownership, defendant informed Lomax that it was a rental car. Defendant produced the rental agreement for which Lomax asked. The rental agreement evidenced the following: 1) another individual named "Junior Santana," a resident of New York, had rented the vehicle at the Hobby Airport, in Houston, Texas, on September 16, 1997; 2) the vehicle was to be returned to that airport by 7:00 p.m. the following day–September 19th; 3) a notation of "add driver $10.50"; and 4) an illegible signature near Junior Santana's signature. Lomax noticed that the rental agreement did not list defendant, in typewriting, as an additional driver. Upon being asked, defendant informed Lomax that "Junior Santana" was his cousin. Defendant told Lomax that defendant had flown from Puerto Rico to Miami, Florida, and then to Houston, Texas, where he and his cousin had rented the vehicle for defendant to drive to New York. Lomax was aware that the vehicle that defendant was driving was known to have easily accessible places in which to hide narcotics.

Believing that the rental agreement did not list defendant as an additional driver, Lomax ran a license plate check to

ensure that the vehicle was not stolen. At some point, Lomax began filling out a warning citation–a courtesy ticket that carries no penalties–for defendant's speeding. Lomax advised defendant that he was giving defendant a warning citation but that he was still awaiting the return of a computer check. Lomax observed that, even after he had informed defendant that he would only receive a warning ticket, defendant continued to exhibit signs of nervousness, such as avoiding eye contact, laughing nervously, and fidgeting; based upon his experience, Lomax found this nervousness unusual. Returning the rental agreement and license to defendant, Lomax explained the courtesy citation, which he was still filling out, to defendant. Lomax asked if defendant had any illegal contraband, such as drugs or stolen goods, in his vehicle. Defendant replied in the negative. Lomax asked if defendant would consent to a search of the vehicle. Defendant answered in the affirmative. Lomax gave defendant the courtesy citation to sign. After defendant signed the citation, Lomax gave defendant a copy of the citation as well as a consent-to-search form. Lomax advised defendant to read the consent form and to ask any questions that he might have before signing it. Defendant signed the consent form. Approximately ten minutes had elapsed between the initial traffic stop and defendant's execution of the consent form.

Around the time that defendant signed the consent form, Patrolman Dale Lane ("Lane")–also of the Shelby County Sheriff's Department–arrived. Although they used a drug detection dog to survey the vehicle, the dog did not alert to the presence of narcotics. Both Lomax and Lane quickly looked around the sedan. At some point, Lane and Lomax saw unopened packages of a pair of pliers and an adjustable wrench in a bag on the floor of the front passenger seat. While standing beside the rear of the vehicle, Lane informed Lomax that he smelled a strong odor of gasoline. Lomax smelled nothing as he suffered from sinus congestion at the time. They asked defendant, who was standing near the rear of the vehicle, to sit in the back of Lane's squad car. As

Lomax was placing defendant in the squad car, defendant volunteered that he had been stopped twice before on his trip and had been searched. When Lomax questioned defendant about these stops, defendant stated that he had no documentation for them. Upon being asked, defendant affirmed that he had been in possession of the vehicle at all times during his trip. Because defendant would have been unable to exit the squad car, Lomax instructed him on how to use its public address system in case he needed to communicate with the officers.

Recalling that it affords easy access to the gas tank, in which drugs have been smuggled, they opened the trunk of the vehicle.[1] Upon pulling the carpet back, Lomax saw a sliver plate, which four bolts fastened and which provided access to the gas tank sending unit, a device that signals the dashboard about the amount of gasoline in the gas tank. Lane and Lomax noticed that the bolts fastening the silver plate had scratches around them as if they had been removed and then replaced. Because the vehicle was new and had very low mileage, Lomax found this apparent removal of the plate unusual. Lomax believed that the tools in the passenger compartment were to be used in removing the silver plate so as to access the gas tank. Lomax and Lane removed the trunk's silver plate to access the gas tank. By inserting a fiber optic scope into the top of the gas tank, Lomax observed white cellophane-covered bundles in the gas tank. Believing that these bundles contained illegal narcotics, Lomax and Lane arrested defendant. At no time during the search did defendant object to its duration or scope. Sometime after the completion of the search, Lomax received the computer check

---

[1]Although it is unclear whether Lomax examined the vehicle's access plate and suspected its removal before he observed the tools in the passenger compartment and before he placed defendant in the squad car, it is clear that Lomax and Lane removed the access plate only after these events.

and learned that the vehicle was not stolen. Seven bundles of cocaine were subsequently seized from the vehicle's gas tank.

## B. Analysis

We review the district court's legal conclusions in a suppression hearing *de novo* and its factual findings in a suppression hearing for clear error. *United States v. Smith*, 263 F.3d 571, 581-82 (6th Cir. 2001). The district court's determination as to the existence of probable cause justifying a traffic stop is a question of law that we review *de novo*. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). The district court's determination as to whether the facts establish an unconstitutional seizure under the Fourth Amendment is a question of law that we review *de novo*. *United States v. Avery*, 137 F.3d 343, 348 (6th Cir. 1997). The district court's determination of whether a search exceeded the scope of consent is a question of fact that we review for clear error. *United States v. Fowler*, 42 F.3d 1389, 1994 WL 685417, at *6 (6th Cir. 1994). When considering the denial of a suppression motion, we must view the evidence in the light most favorable to the government. *United States v. Wellman, Jr.*, 185 F.3d 651, 654-55 (6th Cir. 1999).

### 1. Validity of the Traffic Stop

A traffic stop is reasonable under the Fourth Amendment where the stop was both proper at its inception and "reasonably related in scope to the circumstances . . . [that] justified the . . . [stop] in the first place." *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)) (internal quotation marks omitted). A police officer may lawfully stop a motorist whom he has probable cause to believe has committed a traffic violation. *Id.* However, a police officer cannot continue to detain a motorist after the officer has completed the initial purpose of the traffic stop "unless something that occurred during the stop caused the officer to have a

reasonable and articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

Defendant appeals the district court's denial of his suppression motion on the ground that Lomax's initial stop of defendant's vehicle violated the Fourth Amendment. In particular, defendant argues that Lomax actually stopped defendant's vehicle based upon his suspicion that defendant was involved in illegal drug trafficking, not based upon an alleged speeding violation. However, in *Whren v. United States*, 517 U.S. 806, 813, 819 (1996), the Supreme Court held that, as long as a police officer has probable cause to believe that a motorist committed a traffic violation, the resulting traffic stop is generally reasonable under the Fourth Amendment regardless of the officer's subjective intent or state of mind in conducting the traffic stop. [2] *Accord United States v. Bailey*, 302 F.3d 652, 657 (6th Cir. 2002) (noting that "[i]t is well established . . . that an officer's actual motivation for making a traffic stop is irrelevant to the constitutionality of that stop"); *Wellman*, 185 F.3d at 655 (finding that, where probable cause for the traffic stop exists, whether the police officer was motivated in conducting the traffic stop based upon his "suspicion that the defendant fits into a 'drug courier profile'" or his membership in a drug interdiction unit is irrelevant to the stop's constitutionality under the Fourth Amendment).

Alternatively, defendant contends that Lomax lacked probable cause to justify the traffic stop of defendant's vehicle because defendant had not, in fact, been speeding

---

[2] As evidence that the stop was pre-textual, defendant underscores that Lomax was suspicious of defendant because he had a Puerto Rico driver's license and was driving a vehicle with Texas tags. However, we note that such subjective suspicion is factually–as well as legally–irrelevant to the validity of the initial traffic stop because Lomax only learned about defendant's residency *after* he had stopped defendant's vehicle.

prior to that stop. At the suppression hearing, Lomax testified that, while pacing defendant's vehicle with his squad car, he used both his calibrated speedometer and his radar to determine that defendant's vehicle was traveling at 71 mph in a 65 mph zone. Defendant asserts that this testimony is unworthy of belief. Yet, the only evidence that defendant offers to refute this testimony is his own testimony at the suppression hearing. In particular, defendant testified that he did not "think" that he was speeding because he knew that the posted speed limit was 65 mph, he had cruise control, he had never broken the law, and he had never been stopped for speeding. However, the district court reasonably found that defendant was not a credible witness. For example, defendant later testified that police had stopped him and had given him a courtesy citation the night before Lomax had stopped him. Defendant also demonstrated his propensity to lie under oath when, in 1997, he failed to appear at his arraignment despite having promised the district court, as a condition of his bond, that he would appear at all required proceedings. In an attempt to negate Lomax's testimony, defendant contends that it would have been unreasonable for defendant to have sped past Lomax's squad car since it was clearly visible to passing motorists and was positioned so as to pursue any violators easily. Similarly, defendant argues that it would have been even more unreasonable for him to have *continued* to speed after Lomax began pacing defendant's vehicle. However, as the district court aptly observed, "[c]ommon experience teaches that speeding motorists are usually apprehended when police are positioned to observe them and often when the motorist can observe the officer as well." The district court correctly recognized that, in any event, no evidence in the record demonstrates that defendant is a reasonable motorist. Viewing the evidence in the light most favorable to the government, the district court did not clearly err in choosing to credit Lomax's testimony that defendant was speeding over defendant's self-interested and inconsistent testimony to the contrary. *See Peveler v. United States,* 269 F.3d 693, 702 (6th Cir. 2001) ("We are generally reluctant to set aside credibility determinations made by the trier of fact, who has

had the opportunity to view the witness[es] on the stand and [to] assess . . . [their] demeanor."). Because defendant was speeding in violation of Tennessee law, Lomax had probable cause to stop defendant's vehicle.

Defendant also appeals the district court's denial of his suppression motion on the ground that the traffic stop was not reasonably related in scope and duration to the initial purpose of the stop–the speeding violation. Defendant contends that this initial purpose ended when defendant signed the courtesy ticket and Lomax returned the rental agreement and driver's license to defendant.[3] According to defendant, Lomax then prolonged the detention when he, in effect, informed defendant that he could not leave because Lomax was awaiting the return of a computer check. The thrust of defendant's argument is that it was not "reasonably related" to the speeding violation for Lomax to have conducted a computer check to ensure that defendant was lawfully operating the vehicle because such a check was unnecessary and, thus, unreasonable under the totality of the circumstances. Defendant contends that a reasonable police officer would infer from defendant's illegible signature near the renter's signature and the notation of "add driver $10.50" on the rental agreement that defendant was lawfully operating the vehicle. At the suppression hearing, Lomax testified that, after looking at the rental agreement "closely," he ran the computer check on the vehicle's license plate because he did not see defendant's name "listed"–or printed–on the agreement. Lomax elaborated that about ninety-nine percent of the rental agreements that he had seen listed the name of

---

[3]Defendant argues that Lomax testified that defendant signed the warning ticket *before* Lomax returned the rental agreement and driver's license. However, Lomax actually testified–and the district court found–that Lomax returned the rental agreement and driver's license to defendant *while* Lomax was filling out the courtesy citation and *before* defendant signed it. In any event, after returning defendant's documents and issuing a copy of the signed courtesy ticket, Lomax did continue to detain defendant pending the completion of the computer check.

the additional driver in the same type of print in which the renter's name was listed. Lomax testified that he first recognized the signature on the rental agreement as defendant's after he had returned to the police station and was comparing that document with defendant's driver's license and the courtesy ticket that defendant had signed. As to whether it was reasonable to believe that the vehicle was stolen, Lomax underscored that, along with defendant's name not being printed on the rental agreement, Lomax knew of instances in which authorized individuals had not done something that the rental agreement required them to do. As Lomax testified, "[t]here are always reasons to do checks."

Defendant contends that Lomax's testimony is incongruous with the facts. To the extent that defendant asks us to set aside the district court's determination that Lomax was a credible witness, we find no reason to accept such an invitation. *See Peveler,* 269 F.3d at 702. Moreover, defendant's focus upon Lomax's subjective intent in or justification for running the computer check on the license plate is misplaced. "[T]he touchstone of the Fourth Amendment is reasonableness . . . measured in *objective* terms by examining the totality of the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 39 (1996) (internal quotation marks omitted; emphasis added). Here, while the rental agreement displayed defendant's signature and a charge for an additional driver, defendant's signature was illegible and located in an odd location on that agreement. A reasonable officer likely would not have recognized that illegible signature as belonging to defendant unless and until he placed defendant's driver's license directly beside the rental agreement and compared their respective signatures.[4] A reasonable officer

---

[4] Although defendant contends that Lomax had four documents in his possession containing defendant's signature–his driver's license, the rental agreement, the courtesy citation, and the consent-to-search form–, Lomax only had defendant's driver's license and the rental agreement in his possession at the time that he requested the license plate check.

examining defendant's driver's license probably would have focused upon the picture and the expiration date, as Lomax did. We note that, even if the rental agreement reasonably appeared to authorize defendant as an additional driver, a reasonable police officer would still have good reason to run a license plate check. For example, defendant may have forged that authorization, or the rental company may have rescinded such authorization, even if initially valid, due to a violation of the rental agreement. As the Supreme Court has recognized, states have a critical interest in ensuring that motorists observe licensing and registration requirements as well as a legitimate interest in controlling automobile thefts. *Delaware v. Prouse,* 440 U.S. 648, 658, 659 n.18 (1979). We note that defendant's detention until the completion of the computer check–sometime after the search of the vehicle–was not intrusive. The pendency of the computer check was largely co-extensive with the vehicle search, to which defendant consented before Lomax had finished issuing the warning citation and to whose duration defendant never objected. During the unknown amount of time between the completion of the search and that of the computer check, defendant was under lawful custodial arrest based upon the fruits of the search. In sum, under the totality of the circumstances, it was objectively reasonable and within the bounds of the traffic stop for Lomax to have requested a computer check to ensure that defendant was lawfully operating the vehicle. *See id.* at 663 ("[E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, *or that either the vehicle or an occupant is otherwise subject to seizure for violation of law,* stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.") (emphasis added); *Wellman,* 185 F.3d at 656 (holding that the police officer "lawfully asked defendant to sit in the squad car while he wrote a courtesy citation and performed record checks of his driver's license and registration" as it was within the scope of the traffic stop for speeding); *United States v.*

*Bradshaw*, 102 F.3d 204 (6th Cir. 1996) (holding that the police officer "could lawfully detain . . . [defendant in the back of the squad car] until he had finished performing radio checks and issuing the citation" because it was "well within the bounds of the initial stop."); *Hill*, 195 F.3d at 269 (holding that a driver's license check was within the original scope of a traffic stop based upon a traffic violation). Thus, we reject defendant's contention that Lomax needed a reasonable suspicion that defendant was unlawfully operating the vehicle to justify this detention.[5]

Alternatively, defendant claims that Officer Lomax exceeded the bounds of the initial traffic stop for speeding when he asked whether defendant possessed any illegal contraband. The circuit courts generally agree that the Fourth Amendment requires that, absent additional justification, any questioning during a valid traffic stop must not prolong the detention necessary to complete the initial purpose of that stop; however, there is some disagreement as to whether the Fourth Amendment also requires that, absent additional justification, such questioning must be reasonably related in subject matter to the purpose of the initial traffic stop.[6] This

---

[5]In particular, defendant contends that Lomax only conducted the check because defendant, a resident of Puerto Rico, was driving a vehicle with Texas license tags; according to defendant, such a ground does not afford Lomax reasonable suspicion that defendant was unlawfully operating the vehicle because it is logistically unlikely for a car with Puerto Rico tags to be in the United States.

[6]*Compare United States v. Shabazz*, 993 F.2d 431, 436-37 (5th Cir. 1993) (holding that questions, which, in themselves, are neither searches nor seizures, are relevant to whether a detention has exceeded its lawful duration, and that the police officer's questioning of defendants regarding their recent whereabouts did not exceed the original scope of the traffic stop–for speeding–because it occurred while a computer check was pending and, thus, did not extend the duration of the initial stop), *and United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) ("Because questions are neither searches nor seizures, . . . [q]uestions asked during detention may affect the reasonableness of that detention . . . to the extent

---

circuit has yet to decide this issue *expressly*.[7] Because additional justification supported the questioning here, we need not decide such an important legal issue. Rather, we leave that determination for a case whose record affords a more appropriate basis upon which to make it. First, in asking defendant whether he possessed any illegal contraband, Lomax did not exceed the time necessary to complete the original purpose of the traffic stop. At that time, Lomax had not yet completed the initial purpose of the traffic

---

that they prolong custody, but questions that do not increase the length of the detention (or that extend it by only a brief time) do not make the . . . [detention] itself unreasonable or require suppression of evidence found as a result of the answers.") *with United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001) ("During a traffic stop, a police officer is allowed to ask questions that are reasonably related in scope to the justification for his initiation of contact . . . . In order to broaden the scope of questioning, he must articulate suspicious factors that are particularized and objective."), *and United States v. Holt*, 264 F.3d 1215, 1228-31 (10th Cir. 2001) (holding that "the Fourth Amendment reasonableness of a traffic stop based on probable cause must be judged by examining both the length of the detention and the manner in which it is carried out," and, thus, rejecting the argument that the nature of any questioning during a traffic stop is irrelevant so long as it does not unreasonably prolong that stop's duration).

[7]In *United States v. Palomino*, we held that a police officer did not violate the Fourth Amendment when, following a traffic stop based upon probable cause of a traffic violation, the officer asked the defendant about whether he possessed illegal contraband because the officer "did not detain . . . [the defendant] longer than was necessary for the original purpose of the stop, *and because* there was reasonable suspicion to conduct the brief questioning." 100 F.3d 446, 449-50 (6th Cir. 1996) (emphasis added). One could argue that *Palomino* implicitly holds that questioning during a traffic stop must be reasonably related to the initial purpose of that stop because, absent this requirement, it need not have found that reasonable suspicion for such questioning existed. However, this conclusion is invalid because one of the premises upon which it relies is false. It does not necessarily follow from the premise that additional justification–other than that which justified the initial traffic stop–defeats the defendant's Fourth Amendment claim that such additional justification is *required* to defeat the defendant's Fourth Amendment claim. *See Childs*, 277 F.3d at 951.

stop because he was still filling out the courtesy citation and, as discussed above, was still waiting for the return of the computer check on the vehicle's license plate. Second, assuming that this questioning was not reasonably related to the speeding violation and, thus, that it required additional justification, Lomax had a reasonable suspicion that defendant was engaged in criminal activity so as to validate his inquiry into whether defendant possessed any illegal contraband. At the time of this questioning, Lomax had the following information available to him: 1) defendant's route was circuitous and impractical in that defendant had flown from Puerto Rico to Miami and then to Houston only to rent a vehicle to drive to New York; 2) Junior Santana, a resident of New York, had rented the vehicle in Houston so that defendant could drive it to New York; 3) the rental agreement had an illegible, additional signature in an irregular location rather than defendant's typed name listing him as an additional driver; 4) at the time of the traffic stop, defendant was heading towards New York the day before the rental agreement required the vehicle to be returned in Houston; 5) defendant was unusually nervous; and 6) Lomax knew, based upon his training, that the model vehicle that defendant was driving had easily accessible hiding places for narcotics. Lomax's questioning defendant about whether he possessed any illegal contraband was not unreasonable under the Fourth Amendment.

## 2. The Scope of Defendant's Consent to Search

Defendant appeals the district court's denial of his suppression motion on the ground that the search of defendant's gas tank exceeded the reasonable scope of defendant's consent.[8] "When law enforcement officers rely

---

[8] Defendant has abandoned his argument on appeal that he did not consent to the search of the vehicle. *See Sommer v. Davis,* 317 F.3d 686, 691 (6th Cir. 2003) (holding that plaintiffs abandoned an issue on appeal by not presenting any argument on it in their briefs). Rather, defendant argues on appeal that any evidence flowing from the search must be

upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search." *United States v. Gant,* 112 F.3d 239, 242 (6th Cir. 1997). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness . . . ." *Florida v. Jimeno,* 500 U.S. 248, 251 (1991). The proper question is "what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Id.* A reasonable person likely would have understood his consent to exclude a search that would damage his property. *See id.* at 251-52. Generally, the expressed object of the search defines the scope of that search. *Id.* at 251.

Before Lomax obtained defendant's consent to search the vehicle, he had asked defendant whether he possessed any illegal contraband, such as drugs or stolen goods. In so asking, Lomax thereby had informed defendant that those widely-varied items would be the object of any search. Defendant, per the consent-to-search form that he executed, consented to a search of the vehicle without expressly limiting the scope of that search. It was objectively reasonable for Lomax and Lane to have concluded that this general consent to search the vehicle included consent to search any container within that vehicle that might have held illegal contraband. As Lomax testified, it was well-known that the model vehicle that defendant was driving had an easily accessible gas tank in which to hide narcotics. Moreover, the accessing and search of the gas tank caused no damage to either the vehicle, in general, or the gas tank, in particular. Therefore, it was objectively reasonable for

---

suppressed because defendant was subject to an illegal detention at the time that Lomax secured defendant's consent. It is true that any consent that a suspect gives while being subject to an illegal seizure may be tainted and, thus, invalid. *See Florida v. Royer*, 460 U.S. 491, 507-08 (1983); *United States v. Guimond*, 116 F.3d 166, 170-71 (6th Cir. 1997). However, we reject such an argument here because, as discussed above, defendant's detention at the time that he consented to the search was legal.

Lomax and Lane to have believed that defendant's general consent to search the vehicle encompassed consent to search the vehicle's gas tank. The Fourth Amendment did not require either officer to obtain separate permission to search the gas tank. *See Jimeno,* 500 U.S. at 252. We note that, although defendant had the opportunity to do so, he never objected to the officers' search of the gas tank and, thus, neither clarified that the scope of his sweeping consent excluded such a search nor revoked his consent. *See United States v. Pena,* 920 F.2d 1509, 1514-15 (10th Cir. 1990) (holding that a search of a vehicle's vent panel was within the scope of the defendant's consent to "look" inside the vehicle where the defendant never "attempted to limit or retract his [general] consent" upon seeing the officer begin to remove that panel). The district court did not clearly err in finding that the search of the gas tank fell within the reasonable scope of defendant's consent to search the vehicle. *See United States v. Zapata*, 180 F.3d 1237, 1243 (11th Cir. 1999) (holding that the search of a vehicle's interior door panel was within the scope of the defendant's general consent to search for narcotics, weapons, or money because the door panel could contain such items).

### III. Defendant's Sentence

Defendant appeals the district court's application of a sentence enhancement for obstruction of justice under U.S.S.G. § 3C1.1 on the ground that it violates the extradition treaty with the Dominican Republic.[9] We review the interrelation between the extradition treaty and the application of U.S.S.G. § 3C1.1 of the Sentencing Guidelines *de novo. See United States v. Humphrey,* 279 F.3d 372, 379 (6th Cir. 2002) (holding that "[w]e review *de novo* questions of law

---

[9]Defendant does not claim that U.S.S.G. § 3C1.1 is otherwise inapplicable to his sentence but, rather, simply argues that the extradition treaty with the Dominican Republic trumps the Sentencing Guidelines and renders the application of this provision improper.

concerning the application of the Sentencing Guidelines") (emphasis added); *United States v. Emuegbunam,* 268 F.3d 377, 389 (6th Cir. 2001) (holding that we review *de novo* interpretations of treaties).

The principle of specialty "requires that the requesting country not prosecute for crimes . . . for which an extradition was not granted." *Demjanjuk v. Petrovsky*, 776 F.2d 571, 583 (6th Cir. 1985), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993). Incorporating this principle of specialty, Article IV of the extradition treaty with the Dominican Republic provides that "[n]o person shall be *tried* for any crime or offence other than that for which he was surrendered." Convention for the mutual extradition of fugitives from justice, June 19, 1909, U.S - Dom. Rep., 36 Stat. 2468 (emphasis added). The verb *to try* denotes "to conduct the trial of." Webster's Third New International Dictionary 2457 (1986). In its request for extradition, the government stated that it sought defendant's return to "stand trial" only on count one of possessing cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1); the government recognized that count two concerning defendant's failure to appear at his arraignment in violation of 18 U.S.C. § 3146(a)(1) was not an extraditable offense. Defendant concedes that the government did not violate the express terms of the extradition treaty because it did not, in fact, prosecute defendant for this failure to appear. Rather, defendant argues that the government's promise to prosecute defendant only for the narcotics offense entails the implicit promise that it would also not punish defendant for the failure-to-appear offense. Additionally, according to defendant, the district court's consideration of that failure to appear in enhancing defendant's sentence on the narcotics offense constituted punishment for it contrary to the implicit understanding and spirit of the extradition treaty.

However, the Supreme Court seemingly eschewed such an argument in *Witte v. United States*, 515 U.S. 389 (1995). The issue in *Witte* concerned the Double Jeopardy Clause of the

Fifth Amendment, which bars "successive prosecution or multiple punishment for 'the same offence.'" *Id* at 391. In that case, the district court had determined the defendant's sentence for attempted possession of marijuana with the intent to distribute by considering, along with other relevant conduct, various quantities of cocaine that defendant had previously imported. *Id.* at 393-94. Defendant was later indicted for conspiring and attempting to import this cocaine. *Id.* at 395. Defendant argued that this current indictment on the cocaine offenses "constitute[d] a second attempt to punish him criminally for the same cocaine offenses." *Id.* at 397. Defendant implicitly contended that the district court's consideration of the cocaine in sentencing defendant on the marijuana offense constituted the initial punishment for the cocaine offenses. *See id.* However, the Supreme Court held that the consideration of "related criminal conduct to enhance a defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment for that conduct[.]" *Id.* at 399; *see United States v. Maney*, 226 F.3d 660, 667-68 (6th Cir. 2000) (relying upon *Witte* to hold that the district court's consideration of the defendant's various escape attempts in applying an § 3C1.1 enhancement and in denying a § 3E1.1 reduction was not "punishment" for that conduct because defendant's sentence was within the statutorily authorized range and, thus, that defendant's subsequent conviction and sentence for one of those escape attempts did not raise any issues of double punishment). Rather, the Court clarified that such consideration constitutes "punishment" only for the offense of conviction. *Id.* at 401-04. Thus, the Supreme Court held that the Double Jeopardy Clause did not proscribe sentencing a defendant on a criminal offense when the conduct underlying that offense was a factor in determining the defendant's sentence for a previous conviction. *Id.* at 391, 406. Although it is formally a double jeopardy case, its underlying analytical foundation and, in particular, its conception of "punishment" is nevertheless instructive here.

In *United States v. Lazarevich*, 147 F.3d 1061, 1063 (9th Cir. 1998), the Ninth Circuit held that the district court's consideration of a non-extraditable offense of child abduction in increasing the defendant's sentence for passport fraud–the offense for which defendant was extradited–did not constitute "punishment" so as to violate the extradition treaty's incorporated rule of specialty permitting punishment only for the extradited offense. As that court reiterated, extradition treaties are made "within an historical and precedential context . . . that includes the long-standing practice of United States['] courts of considering relevant, uncharged evidence at sentencing." *Id.* at 1064 (holding that, given the long history of considering relevant evidence, like other criminal behavior, in sentencing–consideration that the Sentencing Guidelines now mandates–as well as Supreme Court precedent, such as *Witte*, the extradition treaty "contemplated consideration of relevant offenses").

Here, we assume *arguendo* that the extradition treaty contains an implicit promise not to *punish* defendant for his failure to appear at his arraignment, rather than merely an express promise not to *prosecute* defendant for any offense other than that for which he was extradited. However, we find that, following the reasoning of both *Witte* and *Lazarevich*, the § 3C1.1 enhancement to defendant's sentence on the narcotics offense based upon defendant's failure to appear at his arraignment did not constitute "punishment" for that conduct so as to violate any implicit proscription against such punishment in the extradition treaty.[10] The district court

---

[10]We note that defendant, in challenging his sentence, may lack standing to rely upon the extradition treaty's incorporated rule of specialty. This circuit has not expressly decided whether an extradited individual has standing to seek the enforcement of that rule. *See Demjanjuk*, 776 F.2d at 583-84 (observing that a serious question existed as to whether the defendant had standing to assert the rule of specialty because "[t]he right to insist on application of . . . [that principle] belongs to the requested state, not to the individual whose extradition is requested" yet addressing the merits of such a claim). Other circuit courts either have

sentenced defendant on the narcotics charge to 97 months of imprisonment–well within that offense's statutory maximum of 480 months of imprisonment.     *See* 21 U.S.C. § 841(b)(1)(B).

Defendant also appeals the district court's denial of a sentence reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 on the ground that, to the extent that a sentence enhancement under U.S.S.G. § 3C1.1 is improper for the reason asserted above, such a reduction is consequently proper.    *See* USSG § 3E1.1, comment. (n. 4) ("Conduct resulting in an enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply.").  Because defendant made his challenge to the denial of a § 3E1.1 reduction contingent upon the success of his challenge to the application of a § 3C1.1 enhancement and

---

declined to decide this issue or have considered the issue yet disagree as to its proper resolution. *See United States v. Saccoccia*, 58 F.3d 754, 767 n.6 (1st Cir. 1995) (observing the inner-circuit split but taking no position on the issue); *United States v. LeBaron*, 156 F.3d 621, 627 (5th Cir. 1998) (clarifying that the Fifth Circuit has yet to decide whether an extradited individual has standing to raise the rule of specialty); *United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 168 (3rd Cir. 1997) ("Because treaties are agreements between nations, individuals ordinarily may not challenge treaty interpretations in the absence of an express provision within the treaty or an action brought by a signatory nation."); *United States v. Levy*, 905 F.2d 326, 329 n.1 (10th Cir. 1990) (holding that an extradited defendant has standing to assert a rule of specialty claim); *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986) (holding that an extradited individual "may raise whatever objections [based upon the rule of specialty that] the rendering country might have"); *United States v. Puentes*, 50 F.3d 1567, 1572 (11th Cir. 1995) (same); *Leighnor v. Turner*, 884 F.2d 385, 388 (8th Cir. 1989) (holding that it is bound to follow a prior opinion that held the same).  However, because we find that defendant's sentence did not violate the extradition treaty's incorporated rule of specialty, we need not decide whether defendant has standing to assert such a claim.

---

because that latter challenge, as discussed above, fails, the former challenge likewise fails.

For the foregoing reasons, we AFFIRM the denial of defendant's suppression motion and his sentence.