NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0571n.06

Case Nos. 21-5354/5355

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Dec 07, 2021<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| JEREMY FIELDS, | ) | |
| Defendant-Appellant. | ) | O P I N I O N |

Before: COLE, GIBBONS, and LARSEN, Circuit Judges.

COLE, Circuit Judge. After a United States probation officer found a gun under Jeremy Fields's bed during a home visit, Fields was convicted at trial of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). As a result of this new conviction, he was also found to have violated the terms of his supervised release. Prior to trial, Fields moved to suppress the firearm as the product of an unlawful search. The district court denied this motion. At trial, Fields's friend Julian Williams testified that the firearm was his, and that he brought it into Fields's home and stashed it in a case under Fields's bed without Fields's knowledge or consent during a night of binge drinking. The jury, unpersuaded by Williams's explanation, found Fields guilty. The district court, equally unpersuaded, sentenced Fields to 63 months in prison, to run consecutively to his 13-month sentence for his supervised release violation. Fields contests each of these decisions. For the following reasons, we affirm.

I. BACKGROUND

On June 15, 2017, Jeremy Fields was released from prison and began a term of supervised release. As a condition of his release, Fields was required to refrain from the excessive use of alcohol and submit to periodic urinalysis. Fields was also prohibited from possessing firearms, ammunition, or other dangerous weapons. *See* U.S.S.G. § 5D1.3(c)(10). Most relevantly, Fields was required to allow his probation officer to "visit" his home at any time. *See* U.S.S.G. § 5D1.3(c)(6). While in Fields's home, the probation officer—by the terms of the supervised release—had permission to confiscate "any items prohibited by the conditions of the defendant's supervision that he or she observes in plain view." U.S.S.G. § 5D1.3(c)(6).

On March 28, 2019, at 7:30 a.m., probation officers Issac Barnett and John Martin knocked on Fields's front door to conduct one of these unannounced home visits. Fields opened the door in a towel and invited the officers inside. When Fields asked if he could change into clothes, the officers instructed him to remain in a towel for their safety. The probation officers did not have a consent-to-search form, nor did Fields's court judgment have an explicit search condition, but when the officers asked if they could conduct a home inspection, Fields agreed.

The officers proceeded to investigate Fields's home. On the first floor, they encountered empty alcohol containers in trashcans, as well as two handheld radios. When questioned about the radios, Fields told Barnett that they were for security detail at a church. Barnett, however, became suspicious that Fields had instead returned to his previous job as a bounty hunter in a fugitive recovery capacity, a profession that normally requires firearms.

Barnett asked for Fields's permission to continue the home inspection, and Fields agreed. Fields eventually took Barnett and Martin to his loft bedroom, which adjoined the home's sole bathroom. In the bedroom, the officers noticed a refrigerator surrounded by more alcohol. Barnett also saw a tactical knife, a paracord bracelet, and a tactical watch on a vanity in the bathroom, even

though Fields had previously denied having any weapons in the home. When Barnett asked to continue the home inspection and look around further, Fields said "okay." (Suppression Hr'g. Tr., R. 111, PageID 332.)

While Fields was speaking with Martin, Barnett investigated an open closet. Fields began to approach Barnett, which Barnett thought was suspicious. After asking Fields to step back, Barnett specifically requested Fields's consent to open a drawer next to the vanity where the knife was and to open the refrigerator, which Fields gave. As he was closer, Martin opened the refrigerator and found even more alcohol. Barnett then sent Fields to perform a urinalysis.

While Fields was in the restroom, Barnett kneeled and looked under Fields's bed with a flashlight. The bed was raised a little over half a foot off the ground and had no bed skirt to obstruct Barnett's view, thus he could easily see the grip of a pistol in a propped-open case. When Barnett retrieved the case, he found that it included not only a Glock 30S pistol loaded with .45 caliber rounds, but a .45 Glock magazine, two holsters (one for carrying a weapon inside the waistband, one for carrying it outside the waistband), handcuffs, a bail agent identification card issued on November 9, 2018, which displayed Fields's name and indicated he was a fugitive recovery agent, as well as other documents with Fields's name and photo on them.

Fields said that the pistol must belong to his brother, Julian Williams. Although Williams and Fields were not blood related, the two were close friends and work partners, to the point that Williams saw Fields almost every day. The night before probation came to Fields's home, the two drank and played cards starting at five or six in the evening until Williams's wife eventually picked him up around two or three in the morning.

Williams returned to Fields's home later that morning to find police officers and other unknown men outside. When Barnett met Williams outside, he saw that Williams had an empty

holster on his hip and asked where Williams's firearm was. Williams replied that it was in the car. When asked why he was there, Williams said he was there to get Fields. Barnett also asked whether Williams had a firearm or any bail agent gear in the house, and he said no. According to Barnett, Williams answered the questions perfectly fine, and did not appear to be unsteady or impaired in any way.

According to Williams, however, when he was answering those questions, he was still either drunk or hungover from the previous night's activities. So much so that he did not remember one crucial detail—*he* had placed the gun under Fields's bed. Williams testified at trial that he brought a concealed Glock 30S pistol to Fields's home without Fields's knowledge. Sometime around midnight, Williams decided that he did not want to have the gun on his person if he drove himself home. While passing through Fields's bedroom to get to the restroom, Williams claimed he made a split-second decision to place the gun in a case under Fields's bed. Williams was already aware that the case was there because he had helped Fields move into the home. Williams also contended that the two holsters Barnett found in the case were his: one was his concealed carry holster for church, the other was one he intended to sell. Williams testified that the night he visited Fields, he removed his Glock from the holster on his hip, placed it in one of the holsters in the case, and then went back downstairs to play more cards and drink.

The firearm found under Fields's bed was, in fact, sold to Julian Williams in July 2016, while Fields was incarcerated. Williams testified that he never gave, sold, or lent the firearm to Fields. When Williams was unexpectedly questioned by officers after a long night of drinking, he answered truthfully as he knew in that moment—he did not have a gun on him, and none of his bounty hunting gear was in Fields's apartment. He did not even realize the gun was missing until he saw law enforcement officers remove it from Fields's home, and he did not know that his close

friend had a felony conviction that prevented him from owning a firearm. Upon this realization, Williams said he eventually told a police officer on the scene that he might have left a gun in Fields's home because he had stayed there for a while, but no one ever followed up with him and he never told police that he specifically left the gun after the night of drinking. As for why he put the gun under the bed, Williams said he was "just drunk." (Trial Tr., R. 112, PageID 642.) In his words, "I mean, you don't recall everything you do when you're intoxicated you just do it." (*Id.* at PageID 643.)

Fields was charged with one count of knowingly possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), as well as having violated the terms of his supervised release. Fields moved to suppress the firearm, arguing that Barnett did not have consent to search under his bed and that the firearm was not in plain view. The motion was denied. Fields then proceeded to trial where, at the close of the government's case-in-chief, he moved for a judgment of acquittal. The district court denied that motion. At the close of all the evidence, Fields renewed his motion, arguing that the government failed to meet its burden to prove Fields knew he possessed a firearm, in light of Williams's testimony. The motion was again denied. The jury found Fields guilty.

The district court combined Fields's sentencing and revocation hearings. During the revocation portion of the hearing, the district court independently found, by a preponderance of the evidence, that Fields knowingly possessed a firearm and had been convicted of another crime, in violation of his terms of supervised release. In doing so, the district court chose not to credit Williams's testimony, noting that it was fundamentally inconsistent. The district court concluded that the fact that the firearm was found along with holsters, Mr. Fields's identification, and badges indicated that he knowingly possessed the gun.

Fields was sentenced to a 63-month term of incarceration for his 2019 charge, followed by a 13-month term for violating the terms and conditions of his release.

## II. ANALYSIS

### A. Motion to Suppress

We first address Fields's motion to suppress. Fields argues that Barnett exceeded the scope of his consent when he crouched down to look under the bed, and therefore that he was not lawfully present in Fields's bedroom as is required for the plain view exception to apply. Therefore, according to Fields, the act of looking under his bed constitutes a search.

"The district court's determination of whether a search exceeded the scope of consent is a question of fact that we review for clear error." *United States v. Garrido-Santana*, 360 F.3d 565, 570 (6th Cir. 2004). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "When reviewing a motion to suppress, [we] must consider evidence in the light most likely to support the district court's decision[.]" *United States v. Marxen*, 410 F.3d 326, 328 (6th Cir. 2005) (internal quotations omitted). "[A] district court's factual findings are accepted unless they are clearly erroneous; however, the district court's application of the law to the facts, such as a finding of probable cause, is reviewed de novo." *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994) (citing *United States v. Thomas*, 11 F.3d 620, 627 (6th Cir. 1993)).

The plain view exception permits the warrantless seizure of an object if "(1) the officer is lawfully positioned in a place from which the object can be plainly viewed; (2) the incriminating character of the object is immediately apparent; and, (3) the officer has a lawful right of access to the object itself." *United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003). Because "[w]here valid consent is given, a search is permissible under the Fourth Amendment even without a warrant

or probable cause," *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006), the district court found that officers were lawfully in Fields's residence and in a position to seize the firearm found in plain view under the bed. Viewing the facts in the record in the light most likely to support the district court's decision, we agree that Fields consented to a home inspection for contraband and therefore the warrantless search under his bed was permissible.

When Barnett knelt to peer under the bed, the firearm was immediately apparent—he did not have to manipulate anything to view the case, nor did he have to open or move the case to see the gun. Fields was not permitted to have firearms in his home, so the gun's contraband nature was immediately apparent. As such, the only issue is whether Barnett was lawfully positioned in a place from which the gun could be plainly viewed. *See Bishop*, 338 F.3d at 626 (6th Cir. 2003).

Fields concedes that he gave consent to inspect his bedroom and that the conditions of his release mandated that he "permit a probation officer to visit him . . . at any time at home," and "permit confiscation of any contraband in plain view." (J. in a Criminal Case, R. 36, PageID 62.) In Fields's view, however, his consent to a home inspection did not encompass consent to search under the bed. Fields focuses his argument on the fact that his supervised release conditions permitted only a "cursory inspection" of the premises as a part of a home visit, rather than including an explicit search condition.

Although it is uncontroverted that Barnett had a right to be in Fields's home, the Supreme Court in *Arizona v. Hicks*, 480 U.S. 321 (1987), held that even when lawfully in position to search for certain objects, searches "separate and apart" from the initial search's objective are unlawful. *Id.* at 324. Looking for contraband, however, was Barnett's explicit objective. Immediately before the contested search, Barnett asked Fields if he could "continue the home inspection and look around further[.]" (Suppression Hr'g Tr., R. 111, PageID 332.) Fields said "okay." (*Id.*) Fields

did not place any limits on the inspection and did not ask what "look around further" meant. *See Jimeno*, 500 U.S. at 251 (1991). It is not relevant that Barnett asked for more specific consent to open drawers and the refrigerator—Fields's initial consent was broad enough to encompass looking under the bed. A reasonable person on supervised release would have known that probation officers were asking for consent to look for contraband, that contraband could be found under a bed, and that the officer could seize contraband if found in plain view. *See id.* Therefore, it is objectively reasonable to conclude that Fields consented to Barnett looking under his bed, such that Barnett did not need to ask for additional consent to do so.

Fields's attempts to argue that Barnett was lawfully able to view containers of alcohol when standing on the bedroom floor, but not a firearm plainly visible under the bed when kneeling on the same floor, are unpersuasive. "[T]hat the [officer] may have to crane his neck, or bend over, or squat, does not render the [plain view] doctrine inapplicable, so long as what he saw would have been visible to any curious passerby." *United States v. Elkins*, 300 F.3d 638, 654 (6th Cir. 2002) (quoting *James v. United States*, 418 F.2d 1150, 1151 n.1 (D.C. Cir. 1969)). Since Fields concedes that Barnett "did not violate a Fourth Amendment privacy interest by standing where he stood when he made the observation," the district court did not err in finding that his investigation under the bed was not a search requiring a warrant. *Id.*

Since we are not left with a definite and firm conviction that the district erred, we affirm the district court's denial of Fields's motion to suppress.

**B. Sufficiency of the Evidence**

In challenging the sufficiency of the evidence, Fields "bears a very heavy burden." *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)). "The evidence is sufficient to support a conviction whenever, 'after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Our role is limited in that we "do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Moreover, we cannot "overturn the jury's decision merely because it had to draw reasonable inferences to find [a defendant] guilty." *United States v. Arnold*, 486 F.3d 177, 181 (6th Cir. 2007) (en banc).

Section 922(g)(1) has four elements: (1) a status element; (2) a possession element; (3) a jurisdictional element; and (4) a firearm element. *Rehaif v. United States*, 139 S. Ct. 2191, 2195–96 (2017). Only the possession element is at issue here. To establish possession, the Government must establish that Fields knew he possessed a firearm. *See United States v. Hobbs*, 953 F.3d 853, 855 (6th Cir. 2020) (quoting *Rehaif*, 139 S. Ct. at 2200). "A jury may convict . . . based on either actual or constructive possession[.]" *United States v. Raymore*, 965 F.3d 475, 483 (6th Cir. 2020) (internal quotation omitted). "[A]ctual possession requires that the defendant have immediate possession or control of the firearm," while "constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise control and dominion over an object, either directly or through others." *Id.* (quotation omitted).

While presence near a firearm is a factor that weighs in favor of constructive possession, the government must provide "other incriminating evidence," whether direct or circumstantial, to establish constructive possession. *Id.* at 484 (quotation omitted). We have considered, in addition to proximity, whether there is a "connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise[.]" *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008) (quoting *United States v. Newsom*, 452 F.3d 593,

610 (6th Cir. 2006)). "Moreover, the government can prove a defendant's control over firearms by showing that he has dominion over the premises in which the firearms are located." *United States v. Layne*, 192 F.3d 556, 572 (6th Cir. 1999).

Here, there was sufficient evidence connecting Fields and the gun. The gun was found in Fields's home, where he was the sole resident and unquestionably exercised domain over the premises. *See Layne*, 192 F.3d at 572. The firearm was under his bed, in a case that contained personal documents with his name, photo identification, and the accoutrement of his profession. In addition, there was evidence of evasive conduct. For example, Fields was less than truthful to probation officers. He stated there were no weapons in the home, while neglecting to mention the tactical knife in the bathroom. Fields walked behind Barnett when he began to look in the bathroom and bedroom closet, causing Barnett to feel as though Fields was attempting to stop or interfere with the search. Fields also repeatedly said that he was not working as a bail agent, but there was a bail agent ID in his home. Finally, there was evidence that Fields had re-entered the bounty hunting business, which supplies a motive for having a gun.

Fields primarily relies on Williams's testimony to show that there was insufficient evidence of possession. It is possible that the jury could have credited Williams's testimony that he drunkenly hid the gun under Fields's bed and suffered from an alcohol-induced fragmentary blackout that caused him to forget he had done so until later. The jury could also have reasonably inferred, however, that Fields knew the gun was under his bed because Williams gave or lent the firearm to Fields and then lied to cover for his friend. This inference is strongest if the jury decided, as the district court did at the sentencing and revocation hearing, that Williams was not credible.

We cannot reevaluate the jury's determination of Williams's credibility. Viewing the evidence in the light most favorable to the prosecution, there was circumstantial evidence that

Fields constructively possessed a firearm. Given that "[i]t is not necessary that such evidence remove every reasonable hypothesis except that of guilt," *United States v. Beverly*, 750 F.2d 34, 37 (6th Cir. 1984) (per curiam), we conclude that there was sufficient evidence for a rational trier of fact to infer that Fields knew he possessed the firearm. Accordingly, we affirm Fields's conviction.

## III. CONCLUSION

For the foregoing reasons, we affirm the denial of Fields's motion to suppress and his conviction.