RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0211p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 19-3703

GREGORY C. RAYMORE,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:19-cr-00081-1—Donald C. Nugent, District Judge.

Decided and Filed:  July 13, 2020

Before:  SILER, MOORE, and NALBANDIAN, Circuit Judges

───────────────

## COUNSEL

**ON BRIEF:**  Matthew M. Robinson, ROBINSON & BRANDT, P.S.C., Covington, Kentucky, for Appellant.  Scott C. Zarzycki, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

NALBANDIAN, J., delivered the opinion of the court in which SILER and MOORE, JJ., joined.  MOORE, J. (pp. 21–24), delivered a separate concurring opinion.

───────────────

## OPINION

───────────────

NALBANDIAN, Circuit Judge.  Sometimes timing is everything.  After this appeal, Gregory Raymore would almost certainly agree.  A jury convicted him as a felon in possession of a firearm before the Supreme Court decided a case that heightened that offense's mens rea

requirement.   Understandably, he failed to challenge his indictment and the court's jury instructions on that basis until this appeal.  Given that, we review those challenges only for plain error and they fail under that standard.  The other arguments he raises against his conviction and his sentence also fail.  So we AFFIRM.

## I.

On an early summer evening in 2018, Eric McCollough visited his father in Elyria, Ohio. During that night, McCollough had his younger brother drop him off near Midview Crossings, an apartment complex where McCollough spent some time with another brother, Tyler Wells, and a close friend, Andre Hines.  Together, the three left for Our Space Lounge, a club in Lorain, Ohio hosting an event that night.  (R. 58, Trial Tr., PageID 354–55.)

As soon as the three arrived at the club, McCollough realized security would not let him inside because he did not have any identification on him.  So he resigned himself to drinking and smoking outside the club.  But Wells and Hines went in for some time before leaving and rejoining McCollough outside.  After that, all three walked down an alley near the club.  And not long after that, they "heard [about six] shots" and McCollough "got hit."  (*Id.* at 362.)  Hines also "got shot" and "fell right next to [McCollough]."  (*Id.*)

After getting shot, McCollough "started [] crawl[ing] . . . along the [side of the] white truck" "to the back . . . [of] the black Nissan" near them.  (*Id.* at 363.)  While McCollough crawled, the Nissan moved and rolled over his hand slightly before it came to a stop.  And during that time, McCollough also heard what he believed sounded like "a gun hitting the concrete"—a sound he recognized from his time growing up in a violent neighborhood and from his time in the military.  (*Id.* at 363–67, 399.)  So he looked around "for the gun [] under the truck . . . [and] went along the back of the truck [] to see [] what was going on."  (*Id.* at 368.)  Doing so, he spotted "a big black guy with dreads" wearing "a hoody standing [t]here" but could not "see what [that guy] [wa]s doing . . . [given] [i]t was kind of dark" out.  (*Id.* at 367–68.)  After "collaps[ing]" "on the ground . . . over by [a nearby] white wall[,]" McCollough tried to get help but "couldn't . . . so [he] hopped up a little more . . . and [] saw the police talking to . . . [t]he guy

in the hoody." (*Id.* at 368–69 (explaining that McCollough "s[aw] th[at] guy run" before seeing officers stop and talk to that guy).)

Multiple officers from the Lorain Police Department (LPD) responded after hearing those gun shots. During their response, officers spotted the same man that McCollough saw and later identified as Gregory Raymore. The officers also recovered three pieces of evidence: a gun near where McCollough heard a "gun hitting the concrete[,]" .45 caliber ammunition in that gun, and a magazine with .45 caliber ammunition in the black Nissan that rolled over McCollough's hand earlier that night. Testing revealed that all the shell casings recovered from the crime scene came from another .45 caliber gun and not from the Smith & Wesson gun officers recovered. But testing and other evidence also connected the three pieces of evidence with Raymore.

So a grand jury returned a true bill on an indictment that charged Raymore as a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment charged that Raymore

> having been previously convicted of crimes punishable by imprisonment for terms exceeding one year, those being: Possession of Drugs, . . . Assault, . . . Aggravated Robbery and Aggravated Burglary, . . . and Felon in Possession of a Firearm, . . . did knowingly possess in and affecting interstate commerce, a firearm, to wit: a Smith & Wesson, Model 1911, .45 caliber semi-automatic handgun, . . . and seven (7) rounds of Fiocchi .45 caliber ammunition, one (1) round of HPR .45 caliber ammunition, and fifteen (15) rounds of Hornady .45 caliber ammunition, said firearm and ammunition having been shipped and transported in interstate commerce

in violation of §§ 922(g)(1) and 924(a)(2). (R. 1, Indictment, PageID 1–2.)

During the prosecution's case-in-chief, Raymore's cousin Sharetta Jackson testified. She explained that she had rented the Nissan found at the crime scene for Pansy Raymore, Raymore's sister. She also testified that Pansy said that she went to Our Space Lounge with Raymore that night. But as far as Jackson knew, only Pansy drove that car. McCollough also testified about his night, the events before the shooting, the shooting, and his observations from after the shooting.

The officers and detective who responded that night also explained their findings and observations to the jury. After the shooting, Officers Brian Andreas and Austin Zubko arrived at the alley together. When they got there, they saw a "muzzle flash[,]" "a lot of people scattering and running[,]" and the victim shot and lying on the alley floor. (R. 59, Trial Tr., PageID 432–33.) They then recounted seeing the man Andreas identified at trial as Raymore emerge and run "with his hands up" towards the officers. (*Id.* at 435–37.)

Andreas explained that he noticed Raymore because, from his experience as an officer, he could tell that Raymore "didn't appear to be scared the way the other people were." (*Id.* at 433–34.) By then the crowd "had [also] cleared . . . out" of the alley and "[e]ssentially the only people still back there w[ere]" McCollough, Hines, and Raymore. (*Id.* at 475, 470 (testifying that Zubko saw no one else in the area in the alley from where Raymore emerged except for McCollough).) And Raymore "c[a]m[e] from" the other part of the alley where it "was significantly darker than the rest of the alley." (*Id.* at 434–35, 470.) So the officers drew their firearms at and stopped Raymore.

Andreas then ordered Raymore to the ground, to put his hands behind his back, and placed handcuffs on him. Andreas also checked Raymore for a weapon but released him after finding nothing and after a "clearly intoxicated" woman told Andreas that Raymore "wasn't involved." (*Id.* at 434, 453–54.) Andreas told Raymore to "get out of here[.]" (*Id.* at 449–50.) Despite Andreas's request, Andreas's dash cam footage showed Raymore "still in the area" after Andreas asked Raymore to leave. (*Id.* at 454.) After the episode with Raymore, Andreas tried to help with crowd control and medical aid.

Like Andreas and Zubko, Officer Juan Rodriguez also particularly noticed Raymore after arriving at the crime scene. (*Id.* at 416.) Though Rodriguez observed "four or five people standing" "a few feet away" from where the victim "was lying" on his back, Raymore especially caught Rodriguez's attention because it "seemed like [Raymore] was just there looking but wasn't concerned." (*Id.* at 414, 417 (explaining that Raymore "was the only one standing there" with nothing to say), 420–21.) Confirming the information on Andreas's dash cam, Rodriguez testified that he saw Raymore "leave[] [a]nd then . . . come back . . . maybe twice [] coming back

and forth." (*Id.* at 414–16.) While Rodriguez treated the victim, another male also arrived near the victim, mentioned "he was related to the victim[,]" and "was very upset." (*Id.* at 421.)

Officer Jamie Ball also testified. He explained that he drove to the crime scene and parked his car "towards the rear of the alley[.]" (*Id.* at 529.) Ball then "attempted to secure the scene" by hanging up yellow caution tape and by pushing those near the victim out of the area. (*Id.* at 530.) While doing so, Ball found "laying on the alleyway" a pair of black leather gloves that matched those an in-club camera caught Raymore taking off earlier that night. (*Id.* at 531; *see* R. 60, Trial Tr., PageID 739–40 (explaining that an in-club camera caught Raymore with one black glove on one of his hands while holding a second in his other hand and moving as if "he was taking them off").) Other officers then marked, bagged, and tagged those gloves. And Ball used his canine to search the area but located nothing else of value.

Officer Christopher Ferenzi also drove his car to the alley and pulled in right behind another patrol car. On his sergeant's orders, Ferenzi helped check the occupied cars in the area and, once the officers "knew [those in the cars] weren't involved," the officers allowed those individuals to leave. (R. 59, Trial Tr., PageID 513.) But Ferenzi "didn't make it down [] to where the incident happened until . . . [about] a half [h]our later or so" because Ferenzi then helped close off the area to the crowds "towards the front." (*Id.* at 514.)

Detective Brian Denman testified as well. He explained that, as it "start[ed] to get lighter outside" that night, Denman discovered a "Smith and Wesson SW1911" gun under the "white box truck" that McCollough had crawled next to earlier that night. (*Id.* at 573–74, 579.) After "render[ing] the gun safe," Denman found "a total of eight rounds" of .45 bullets—"seven [Fioche bullets]" and a "hollow point" (HPR) bullet—in the gun. (*Id.* at 578–80.) He also found "scrape[s] . . . on the [gun's] handle and [] the barrel . . . [or] the actual slide" on the side of the gun that had been on the pavement. (*Id.* at 602–603 (testifying he found no defects on "the upper portion" or "the other side of the gun").)

Officers also executed a warrant to enter and search every car in the area including the black Nissan in the alley that had slightly run over McCollough's hand earlier that night. (*Id.* at 581, 571 (explaining that when Denman arrived "no doors [we]re open on th[e] [Nissan]" but that "[p]rior to [his] arrival . . . [he] had heard the vehicle was open at one point").) Only the Nissan contained any gun magazines or bullets. (*Id.* at 584–87 (explaining that Denman found inside the Nissan a bullet on the driver's seat, a magazine containing fifteen .45 caliber bullets on the driver's floor, and a shell casing in the car's "window tray" or the windshield).)

In front of that Nissan, Denman also found five .45 caliber shell casings. On its passenger seat, he found a black iPhone. The vehicle's open center console also contained a ticket with "Pansy Shirley Marie Raymore" on it. (*Id.* at 585.) The officers did not swab inside the car for DNA. And they unsuccessfully fingerprinted its interior.

Detective Buddy Sievert (the lead investigator) then requested testing on the collected evidence and different witnesses presented the results at trial. Detective John Dougherty testified that the data he extracted from the recovered iPhone revealed the phone owner's information including the email address associated with the owner's Apple ID: "GregoryRaymore814@icloud.com." (R. 58, Trial Tr., PageID 332–33.) From that, Dougherty concluded that the phone found was Raymore's. Sievert's analysis of the iPhone's extracted data also revealed the user's text messages on the "day prior" to the shooting with a contact named "Doyal[.]" (R. 60, Trial Tr., PageID 776–80 (explaining that Raymore confirmed his friend Doyal Cannon also attended the party at the club on the night of the shooting).) In response to "Doyal" asking "Bra, . . . you got some .45 shells?" (which in Sievert's experience as a police officer meant ".45 caliber bullets"), the iPhone user answered "Yeah." (*Id.* at 778–79.) To that affirmative response, Doyal texted, "I need some." (*Id.* at 779.) But the user responded again: "Nope, I got four." (*Id.*)

The Ohio Bureau of Criminal Identification (BCI) lab also analyzed the evidence collected for gunshot residue particles (GSR)—"microscopic residue expelled from a weapon when it is discharged"—and DNA. (*See, e.g.*, R. 59, Trial Tr., PageID 608.) BCI's testing revealed GSR on the black gloves Ball recovered near the club that night. It also found Raymore's DNA profile a major contributor—"meaning [Raymore's DNA] profile was so much

more elevated than the others"—on the interior of those gloves as well as on the extended magazine and on the iPhone found inside the Nissan. (R. 60, Trial Tr., PageID 675–78 (explaining that everyone, even brother and sister, have different DNA profiles "with the exception of identical twins"); R. 59, Trial Tr., PageID 589.)

The testing revealed the same as well on the Smith & Wesson's overall exterior including the base of the gun's magazine—the part of the magazine "where a hand would touch it[] when [the user] push[es the magazine] in" the gun. (R. 60, Trial Tr., PageID 681–83.) BCI could not, however, testify to DNA on the gun's trigger because data from the trigger "was not sufficient for [BCI] to make a comparison." (*Id.* at 676–77.) But it identified Raymore as the single source of DNA on the part of the magazine inside the recovered gun, "meaning no other person's DNA [was found] on that" part of the magazine. (*Id.* at 677–78.) For the DNA found on the gun's exterior and inside the gloves, BCI could rule out McCollough, Hines, and Raymore's friend Doyal.

Special Agent Gerrod Briggs—a criminal investigator experienced in determining the interstate nexus for firearms and ammunition—also analyzed the evidence. He concluded that the Smith & Wesson, the ammunition in that gun, and the ammunition in the Nissan "were not manufactured in the State of Ohio." (*Id.* at 717.) Instead, those items had "traveled interstate and/or [in] foreign commerce in order to be found in the State of Ohio"; the Smith & Wesson "was manufactured . . . [in] Houlton, Maine[,]" the bullets in that gun were made in Missouri and Arizona, and the "Hornady .45 ammunition" contained in the magazine found in the Nissan were "manufactured in Nebraska." (*Id.* at 711, 713, 715–17.)

After the close of the prosecution's case, Raymore moved for, and the district court rejected, a judgment of acquittal under Federal Rule of Criminal Procedure 29. So Raymore's sister testified on his behalf. Pansy also went to the club that same night and remembered seeing Hines's body on the ground "in front of [her] car" after the shooting occurred. (R. 61, Trial Tr., PageID 829–30.) She confirmed that the iPhone officers had recovered was Raymore's but that she and her son would "from time to time . . . [also] use" that iPhone. (*Id.* at 810, 833–34.) She also confirmed she drove the Black Nissan that Jackson had rented for her to the club that night. (*Id.* at 808–10.) And Pansy unequivocally asserted she "did not" bring bullets with her in the car

that night but that her son's father (also in the area that night) had a magazine connected to his gun that night.  (*Id.* at 826, 837–38 (testifying that her son's father "[wa]s the only person [she] saw with anything like that").)

But Pansy had trouble recalling other details about that night.  (*Id.* at 822–26 (explaining that she had trouble precisely recalling the events that night because "[there] was a lot going on" for her given "[she was] having a confrontation with [her son's father] at the time" and because those events occurred a year before the trial).)  She first testified that nobody rode in that car with her to the club, that Raymore "was [not at] any time [] in the car that evening[,]" that Raymore never used the car the week Pansy had it, and that she parked the Nissan "in[] [the] alley on the side of the" club.  (*Id.* at 809–10, 815, 833 (explaining that if Jackson testified to the fact that Pansy told Jackson that Raymore "was in the car . . . that night . . . then [Jackson] would be mistaken as to that fact").)  She also testified, however, that she "may have" told detectives the night of the shooting that she "w[as]n't sure whether [Raymore] was in [her] car" that night.  (*Id.* at 822.)  Pansy also explained that she "might have" left her car keys in her car while she "mingled and mixed" in the parking lot near the alley or that they "might have been" "in [her] bra" during that time.  (*Id.* at 820–21 (explaining she "really c[ould]n't recall" before asserting her keys were in both her bra and her car that night "because [she] went back and forth to the car a couple times").)  She had also possibly left her car doors open when the gunshots went off but she "c[ould]n't remember."  (*Id.* at 825–26 (verifying that "[s]ome time during the night, [her car doors] were open").)

After Pansy's testimony, the defense rested, and Raymore did not renew his Rule 29 motion.  The judge then read Raymore's indictment to the jury and gave them instructions for their deliberations.  He explained to them that Raymore stipulated that he "was [previously] convicted of a crime punishable under the laws of the State of Ohio by a term of imprisonment exceeding one year."  (*Id.* at 847.)  He also explained that to convict Raymore the jury must find beyond a reasonable doubt

> that the Defendant has previously been convicted of a crime punishable by imprisonment for more than one year[,] . . . that the Defendant, following his conviction, knowingly possessed the firearm and/or ammunition specified in the

> indictment[, and] . . . that the specified firearm and/ or ammunition crossed a state line prior to the alleged possession.

(*Id.* at 859.) And the judge explained that while

> it is not necessary for the Government to prove . . . that at the time of the possession[] the Defendant knew that he was breaking the law[, i]t is sufficient if [the jury] find[s] beyond a reasonable doubt that he knowingly possessed the firearm and/or ammunition in commerce after being convicted of a felony offense.

(*Id.* at 861.)

The jury convicted Raymore. At sentencing, the district court explained that Raymore's prior convictions under Ohio Rev. Code §§ 2903.13(A) and 2911.01(A)(1), for assault and aggravated robbery, respectively, allowed the court to enhance his sentence under United States Sentencing Guidelines § 4B1.2. It calculated Raymore's "total offense level [a]s 26[ and his] criminal history category [a]s V[,] . . . giv[ing] [the court] a range of 110 to 120 months." (R. 57, Sent. Tr., PageID 242.) The court also mentioned the 18 U.S.C. § 3553 factors and heard from Raymore, his attorney, and the government. It then sentenced Raymore to twenty-four months' imprisonment for violating his supervised release "to be served consecutively with" 110 months' imprisonment for the firearm possession, "followed by three years of supervised release." (*Id.* at 257.) Raymore appeals.

## II.

On appeal, Raymore alleges three errors. First, Raymore claims the district court erroneously rejected his Rule 29 motion given the insufficient evidence to support his conviction. (Appellant's Br. at 10–20.) Second, Raymore argues that his indictment was insufficient and that the jury instructions "[f]urther[] compound[ed] th[at] error[.]" (Appellant's Br. at 20–28.) Last, Raymore urges us to find that the district court improperly enhanced his sentence because his prior offenses for assault and aggravated robbery did not qualify as "crimes of violence" under § 4B1.2. (*Id.* at 28–36.)

**A.**

Raymore's first argument fails.  Section 922(g)(1) makes it "unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . [to] possess in or affecting commerce, any firearm or ammunition[.]" § 922(g)(1).  Those convicted for a felon-in-possession violation face a fine, "imprison[ment for] not more than 10 years, or both."  § 924(a)(2).

A jury may convict a defendant for a § 922(g)(1) violation "based on either actual or constructive possession of a firearm."  *United States v. Grubbs*, 506 F.3d 434, 439 (6th Cir. 2007).  While actual possession "requires that the defendant have 'immediate possession or control' of the firearm[,] . . . '[c]onstructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'"  *Id.* (citation omitted) (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973), *abrogated on other grounds by Scarborough v. United States*, 431 U.S. 563 (1977)).  But "'presence alone' near a gun does not . . . prove constructive possession." *Id.* at 439–40 (original alterations omitted) (quoting *United States v. Arnold*, 485 F.3d 177, 183 (6th Cir. 2007)).  "Instead, 'other incriminating evidence must supplement a defendant's proximity to a firearm in order to tip the scale in favor of constructive possession.'" *United States v. Carruthers*, 511 F. App'x 456, 459 (6th Cir. 2013) (original alterations omitted) (quoting *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008)).  The jury can find both actual and constructive possession with direct or circumstantial evidence.  *United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013).

For a § 922(g)(1) violation, "the government must [also] show that [the defendant] knew the facts underlying his status"—that the defendant "knew that he had been convicted in any court of [a felony.]"  *United States v. Hobbs*, 953 F.3d 853, 856 (6th Cir. 2020) (internal quotation marks and original alterations omitted) (quoting *Rehaif v. United States*, 139 S. Ct. 2191, 2198 (2019); § 922(g)(1)).  A jury may also infer that mens rea element from circumstantial evidence. *Rehaif*, 139 S. Ct. at 2198.  And proof that the firearm traveled through interstate commerce can satisfy the statute's nexus requirement.  *E.g.*, *United States v. Loney*, 331 F.3d 516, 524 (6th Cir. 2003).

To successfully preserve a Rule 29 motion for appeal, the defendant must make the motion "at the end of the prosecution's case-in-chief *and* at the close of evidence." *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (emphasis added) (quoting *United States v. Chance*, 306 F.3d 356, 368–69 (6th Cir. 2002)). Failure to do so "constitutes a waiver of the objections to the sufficiency of the evidence." *Id.* (same). When the defendant "fail[s] to make a timely renewal of his [previously unsuccessful] Rule 29 motion at the close of all the evidence[,]" like Raymore did, we review that challenge under a "'manifest miscarriage of justice' standard." *Id.* at 696–97 (quoting *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002)). Under that standard, we will not reverse a conviction unless "the record is devoid of evidence pointing to guilt." *Id.* at 697 (same).

We cannot find the record "*devoid* of evidence pointing to [Raymore's] guilt." That the evidence satisfied Raymore's status as a felon and the interstate commerce nexus requirement was never in true dispute. The record also includes at least some evidence that allowed a jury to conclude Raymore constructively possessed the Smith & Wesson and the ammunition in that gun. Multiple witnesses testified to spotting Raymore at the scene around the time McCollough heard a gun drop on the pavement. Scratches found on the side of the Smith & Wesson facing the pavement helped corroborate McCollough's testimony. And at least one witness recounted seeing *only* Raymore and McCollough emerge from the area where officers found that gun. Of the two, BCI found only Raymore's DNA on the gun. They also found Raymore as a major contributor of DNA on the Smith & Wesson—"meaning his [DNA] profile was so much more elevated than" any other DNA found on the gun. (R. 60, Trial Tr., PageID 677.) And the jury heard about the lab tests that revealed Raymore as the single source of DNA on part of the magazine in that gun.

In addition, at least one witness testified, and a camera confirmed, that Raymore remained at the crime scene even after officers asked him to leave, which allowed the jury to conclude that Raymore intended to exercise dominion and control over the gun. The jury could also infer the same from witnesses' testimony on Raymore's demeanor after the shooting. The jury also heard that Raymore wore black gloves like those found at the crime scene and that the recovered gloves contained GSR and Raymore's DNA. The jury heard testimony connecting

Raymore to the Nissan in which officers found the other gun magazine as well. And BCI again identified Raymore as a major contributor of DNA found on that magazine, allowing the jury to infer that Raymore knowingly exercised control over or constructively possessed it.

BCI's analysis revealed Raymore's DNA as a major contributor on the iPhone as well. The jury also heard testimony from Pansy that Raymore owned the phone. And despite Pansy's testimony that others used that phone, the jury could conclude that Raymore authored the messages that confirmed he knowingly controlled .45 caliber ammunition, the same type of ammunition in the Smith & Wesson and in the magazine recovered from the Nissan.

The witnesses' testimony and the evidence from the lab analyses "clearly constitute[d] *some* evidence probative of [Raymore's] possession of" the Smith & Wesson, the ammunition in that gun, and the magazine in the Nissan. *United States v. Clemons*, 427 F. App'x 457, 461 (6th Cir. 2011). We also cannot find that any inferences the jury had to draw to conclude Raymore constructively possessed the gun irrational. *See Carruthers*, 511 F. App'x at 460 ("The critical point is that the jury could have drawn different inferences from the Government's evidence, and our mandate is to affirm when the jury's choice was a rational one." (original alterations omitted) (quoting *United States v. Arnold*, 486 F.3d 177, 181–82 (6th Cir. 2007) (en banc))). And a jury could infer from Raymore's stipulation to his prior felony conviction the requisite knowledge of his status for a § 922(g)(1) violation. *See, e.g.*, *United States v. Conley*, 802 F. App'x 919, 923 (6th Cir. 2020) (acknowledging that while a stipulation to a prior felony "does not automatically establish knowledge of felony status, *it is strongly suggestive of it*" (emphasis added)). So Raymore's conviction is not "a manifest miscarriage of justice" and his first challenge fails.

**B.**

Raymore's challenges to the sufficiency of the indictment and the court's jury instructions also fail. He urges us to find the indictment failed to allege a mens rea element required after *Rehaif*. Given that failure, he argues that "the district court lacked jurisdiction to convict and sentence" him. (Appellant's Br. at 22.) The jury instructions "compound[ed] th[e] error" in the indictment because Raymore asserts that the court "affirmatively instructed [the jury] that the Government did *not* need to prove scienter, in direct violation of *Rehaif*." (*Id.*)

Because the Supreme Court decided *Rehaif* in 2019, Raymore challenges his indictment and jury instructions on that basis for the first time on appeal. So we review only for plain error. *United States v. Howard*, 947 F.3d 936, 942–43 (6th Cir. 2020). We do so even for unpreserved errors that result from intervening authority unavailable at the time of the relevant proceedings. *Henderson v. United States*, 568 U.S. 266, 273–74 (2013).

On plain-error review, we must determine whether

(1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings."

*Howard*, 947 F.3d at 943 (original alterations omitted) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)). We also construe the indictment liberally in favor of its sufficiency and will reverse the conviction only if we cannot reasonably construe the indictment to charge a crime. *Id.* at 942.

An indictment's failure to allege an element of a crime does not strip the district court of its subject matter jurisdiction. *Hobbs*, 953 F.3d at 856–57 (rejecting a defendant's challenge that his indictment's failure to charge the mens rea element required after *Rehaif* stripped the district court of subject matter jurisdiction over the defendant's case). Raymore's jurisdictional challenge fails.

Under plain-error analysis, Raymore's challenge to his indictment's sufficiency also fails. "[A]n indictment that recites statutory language in describing the offense 'is generally sufficient . . . as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *United States v. Hudson*, 491 F.3d 590, 593–94 (6th Cir. 2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). But the statute and the indictment here fail to "set forth the" knowledge element required by *Rehaif*. *Conley*, 802 F. App'x at 923. The indictment instead "include[s] a knowledge component for the possession element, but not the status element, [] suggest[ing] . . . that knowledge is required for possession but not felony status." *Id.*

Even so, we cannot find that the indictment affected Raymore's substantial rights. Raymore stipulated to his felony convictions. We have explained that while that stipulation "does not automatically establish [Raymore's] knowledge of [his] status, it is strongly suggestive of it." *Id.* On top of that, "this [was] [Raymore's] third time being in possession of a firearm while being a convicted felon." (R. 57, Sent. Tr., PageID 246.) His prior convictions for being a felon in possession make it near-impossible for him to contest knowledge of his status as a felon in this case.

The implication of Raymore's stipulation to his prior felony conviction also satisfied the purpose of requiring an indictment to contain all elements of the crime charged: "to ensure that an accused is reasonably informed of the charge made against him so that he can prepare a defense." *United States v. Cor-Bon Custom Bullet Co.*, 287 F.3d 576, 580 (6th Cir. 2002). And we cannot find that the indictment's omission "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" given the stipulation and the other evidence—*e.g.*, testimonial and DNA—that the government presented to the jury. *See Conley*, 802 F. App'x at 924.

We review a defendant's challenges to jury instructions, raised for the first time on appeal, for plain error as well. *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006). Regardless of whether the jury instructions contained an error that was plain, Raymore cannot meet the last two prongs of the plain-error analysis. "[B]ased on his multiple prior convictions" including more than "one prior conviction for being a felon in possession of a firearm," Raymore "undoubtedly knew he was a felon in possession . . . [and] again, [he] stipulated at trial that he was a felon at the time of his firearm possession." *Conley*, 802 F. App'x at 923. Any failure to instruct the jury that a conviction required a finding that Raymore knew his status did not affect his substantial rights or the fairness, integrity, or public reputation of the trial.

## C.

Last, Raymore argues that the sentencing court should not have enhanced his sentence under § 4B1.2 because his prior convictions do not qualify as "crime[s] of violence[.]" § 4B1.2(a). Raymore raised this challenge below, so we review de novo. *United States v.*

*Cooper*, 739 F.3d 873, 877 (6th Cir. 2014). And we find that our precedent controls; Raymore's prior convictions under Ohio Rev. Code §§ 2903.13(A) (assault) and 2911.01(A)(1) (aggravated robbery) each qualify as a "crime of violence" under § 4B1.2. *See, e.g.*, *United States v. Johnson*, 933 F.3d 540 (6th Cir. 2019); *United States v. Patterson*, 853 F.3d 298 (6th Cir. 2017) (Ohio aggravated robbery); *United States v. Evans*, 699 F.3d 858, 862–64 (6th Cir. 2012) (Ohio assault), *abrogated on other grounds by United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc) (per curiam).

Section 4B1.1 advises district courts to apply a sentencing enhancement for adult offenders who "at the time the defendant committed the instant [felony] offense of conviction . . . has at least two prior felony convictions of either a crime of violence or a controlled substance offense." § 4B1.1(a). Section 4B1.2(a)'s elements clause defines "crime of violence" as a felony with "an element the use, attempted use, or threatened use of physical force against the person of another[.]" § 4B1.2(a)(1).

To determine whether an offense qualifies as a "crime of violence" under the elements clause, we determine "whether every defendant convicted of that state . . . felony *must have* used, attempted to use, or threatened to use physical force against the person of another *in order to have been convicted*[.]" *United States v. Burris*, 912 F.3d 386, 392 (6th Cir. 2019) (en banc) (plurality opinion). To answer that question, we use one of two approaches. For non-divisible statutes, we use the categorical approach. Under that approach, we compare the statutory definitions of the crime of conviction ("the elements") with § 4B1.2's elements clause. *Id.* at 392–93 (plurality opinion) (quoting *Descamps v. United States*, 570 U.S. 254, 261 (2013)) (explaining this approach "prohibits federal sentencing courts from looking at the particular facts of the defendant's previous state or federal felony convictions"). For divisible statutes (those that contain "one or more elements of the offense in the alternative"), we use the modified categorical approach. *Id.* at 393 (plurality opinion) (quoting *Descamps*, 570 U.S. at 257). Under that approach, sentencing courts may "consult a limited class of documents to determine which alternative formed the basis of the defendant's prior conviction." *Id.* (original alterations omitted) (quoting *Descamps*, 570 U.S. at 257). The sentencing court then uses the categorical

approach to determine whether the alternative set of elements "under which . . . the defendant was convicted" qualifies as a crime of violence. *Id.*

Raymore starts his argument by alleging that our en banc decision in *Burris* bars us from finding that his prior assault conviction qualifies as a crime of violence. He asserts that we found in *Burris* that Ohio Rev. Code § 2903.11(A)(1) (felonious assault) "[is] categorically not a crime of violence." (Appellant's Br. at 34.) Given the "[near-]identical" language between Ohio's assault statute and Ohio's felonious-assault statute in *Burris*, he urges us to find *Burris* prevents sentencing courts from considering an Ohio assault conviction a "crime of violence." (*Id.* at 34–35.)

Raymore is mistaken. True, we found in *Burris* that "Ohio's felonious-assault and aggravated-assault statutes . . . appear to criminalize more conduct than is described in" the guidelines.[1] 912 F.3d at 397 (plurality opinion). We did so because "a person c[ould]" violate part of those statutes "without using, attempting to use, or threatening to use physical force against the person of another[.]" *Id.* (citing § 4B1.2(a)(1)). Those statutes, in part, "criminalize[d] . . . knowingly . . . [c]aus[ing] . . . [a]ny mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment[.]" *Id.* at 393–94 (plurality opinion) (quoting Ohio Rev. Code § 2903.11(A)(1); Ohio Rev. Code § 2903.12(A)(1); Ohio Rev. Code § 2901.01(A)(5)(a)) (arriving at this conclusion given the statutes prohibited knowingly causing *serious* physical harm to another and the state defined serious physical harm to include any mental illness). Ohio law also confirmed that "there is a realistic probability" that the state would apply those statutes "to conduct that falls outside of the

---

[1]Before this court decided *Burris*, a panel of this court had found "both Ohio felonious assault and Ohio aggravated assault qualify as violent-felony predicates" under the Armed Career Criminals Act's (ACCA) elements clause. *Burris*, 912 F.3d at 394 (plurality opinion) (citing *United States v. Anderson*, 695 F.3d 390, 399–402 (6th Cir. 2012)). We had reasoned in *Anderson* that the prohibitions under those state provisions—"serious physical harm"—"necessarily require[d] proof that the defendant used 'force capable of causing physical pain or injury.'" *Id.* at 395 (plurality opinion) (quoting *Anderson*, 695 F.3d at 400–01). Later panels of this court then applied *Anderson* to find that the same state provisions also qualified as crimes of violence under the guidelines. *Id.*

Thirteen judges of the en banc court—six in the *Burris* plurality and seven in concurrence/dissent—found *Anderson*'s analysis incorrect. *Id.* at 397–402 (plurality opinion), 411–18 (Cole, C.J., concurring in part and dissenting in part) (agreeing with the plurality's decision to overrule *Anderson*). Given that, they also found Ohio felonious and aggravated assault too broad to categorically qualify as a crime of violence under § 4B1.2's elements and enumerated-offense clauses. *See id.* at 399–401 (plurality opinion), 418 (Cole, C.J., concurring in part and dissenting in part).

conduct described in" § 4B1.2. *Id.* at 398–99 (plurality opinion). So we concluded that "Ohio's felonious-assault and aggravated-assault statutes are [] too broad to categorically qualify as violent-felony predicates under" § 4B1.2's enumerated-offense and elements clauses. *Id.* at 399–401 (plurality opinion); *see also id.* at 418 (Cole, J., concurring in part and dissenting in part).

But we also held that Ohio's felonious-assault statute is divisible. *Id.* at 405 (plurality opinion), 410 (Rogers, J., concurring in part and in the judgment) (joining the plurality's conclusion that Ohio Rev. Code § 2903.11(A) is divisible), 411 (Kethledge, J., concurring in the judgment) (explaining that the plurality "correctly h[e]ld[]" that Ohio Rev. Code § 2903.11(A) is divisible). And we concluded that "the (A)(2) version" of Ohio's felonious-assault statute—the "version" containing the language Raymore points to as "identical" to the statute underlying his assault conviction—"qualifies" as a crime of violence. *Id.* at 405–07 (plurality opinion), 410 (Rogers, J., concurring in part and in the judgment) (joining the plurality's finding that the (A)(2) version of Ohio felonious assault qualifies as a crime of violence), 411 (Kethledge, J., concurring in the judgment). Because the *Burris* defendant "was sentenced for the [] version of Ohio felonious assault" that qualified as a violent-felony predicate under § 4B1.2, we affirmed the district court's judgment. *Id.* at 407 (plurality opinion), 410 (Rogers, J., concurring in part and in the judgment), 410–11 (Kethledge, J., concurring in the judgment).

So *Burris* provides Raymore no support for his argument that his conviction under Ohio Rev. Code § 2903.13(A) does not qualify as a crime of violence. The identical language in the offense underlying his conviction and part of "the (A)(2) version" in *Burris* supports finding the opposite—that Raymore's conviction for Ohio assault is a "crime of violence."**[2]** And we concluded as much in an opinion pre-dating *Burris*. *See Evans*, 699 F.3d at 863 (explaining that

---

**[2]**We acknowledge that *Burris* dealt with a slightly different statute than the one we consider here. Like the provision underlying Raymore's conviction (Ohio Rev. Code § 2903.13(A)), *Burris* addressed an Ohio law that prohibited "caus[ing] physical harm to another or to another's unborn[.]" Ohio Rev. Code § 2903.11(A)(2). But that provision also included a deadly weapon provision. *See Burris*, 912 F.3d at 405 (plurality opinion) (explaining that (A)(2) prohibited that conduct when done "by means of a deadly weapon or dangerous ordinance" (quoting Ohio Rev. Code § 2903.11(A)(2))). Even so, *Burris* explicitly acknowledges that provision's prohibition against "physical harm" before finding it qualifies as a crime of violence. *See id.*; *see also id.* at 410 (Rogers, J. concurring in part and in the judgment). And we already concluded before *Burris* that Ohio Rev. Code § 2903.13(A)—a prohibition against "knowingly caus[ing] or attempt[ing] to cause physical harm to another" or to another's unborn *without* a deadly weapon requirement—amounted to a crime of violence under § 4B1.2(a)(1). *See Evans*, 699 F.3d at 863. *Burris* does not upset that previous determination.

a "[c]onviction under the Ohio statute, § 2903.13(A), [] necessarily requires proof that a defendant knowingly used, or attempted to use, physical force capable of causing physical pain or injury and, accordingly, qualifies as a crime of violence under § 4B1.2(a)(1)").

But Raymore urges us to find that our decision in *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc) (per curiam) overruled this part of *Evans*. In *Havis*, we addressed "[t]he question [of] . . . whether the definition of 'controlled substance offense' in § 4B1.2(b) includes attempt crimes." *Id.* at 385. Application Note 1 to § 4B1.2(b) included them despite the plain language in the guidelines' text that "sa[id] nothing about attempt crimes." *Id.* at 385–86. Because we found Application Note 1 "*add*[*ed*] an offense not listed in the guideline" rather than *interpreted* the guidelines' text, we concluded that "attempt crimes do not qualify as controlled substance offenses." *Id.* at 386–87. Based on that determination and because the Tennessee statute in question covered "attempted delivery of a controlled substance, [we concluded that] the district court erred by using [that] [] conviction as a basis for" the sentencing enhancement; we reversed the district court's decision and remanded. *Id.* at 387.

*Havis* does not apply here for two reasons. First, § 4B1.2(a)(1)'s *text* rather than its commentary includes felonies with "an element the . . . *attempted* use, or threatened use of physical force" as "crime[s] of violence." § 4B1.2(a)(1) (emphasis added); *see also Havis*, 927 F.3d at 386 (quoting § 4B1.2(a) to show that "the Commission knows how to *include* attempt crimes [in the guidelines] when it wants to" (emphasis added)). Any argument Raymore makes based on our discussion on attempt crimes in *Havis* does not apply here. Second, *Havis* only abrogated part of *Evans*. It did so only to the extent that *Evans* had concluded that the Application Note 1 discussed in *Havis* allowed the district court to enhance the defendant's sentence for a prior offense that permits convictions "for a *mere 'offer* to sell' drugs." *Evans*, 699 F.3d at 866–68 (emphasis added) (explaining that a conviction under the offense "is properly considered an attempt to transfer a controlled substance, which is a 'controlled substance offense' under the Guidelines" (citing § 4B1.2, Application Note 1)). But *Havis* did not abrogate our conclusion in *Evans* that Ohio Rev. Code § 2903.13(A) qualifies as a crime of violence.

And we have in fact continued to use our decision in *Evans* on Ohio's assault statute and § 4B1.2(a) as good law. About two months after this court decided *Havis*, we decided *Johnson*,

933 F.3d 540. In *Johnson*, this court addressed whether the defendant's prior convictions for robbery under Ohio Rev. Code § 2911.02(A)(2) qualifies as a crime of violence under the sentencing guidelines. *Id.* at 543 (explaining that the relevant sentencing provision § 2K2.1(a)(2) referred to § 4B1.2(a)'s definition of "crime of violence"). Given the shared language in Ohio's robbery and assault statutes, we looked to *Evans*'s analysis of Ohio Rev. Code § 2903.13(A) as relevant authority to answer that question. *Id.* at 544–45 (explaining that both Ohio Rev. Code §§ 2903.13(A) and 2911.02(A)(2) prohibit "physical harm"); *see also id.* at 545 (finding that "no distinction [] would render the analysis in *Evans* . . . inapplicable" in *Johnson*). Applying the reasoning in *Evans* that led us to find Ohio Rev. Code § 2903.13(A) qualifies as a crime of violence, we concluded that robbery under Ohio Rev. Code § 2911.02(A)(2) qualifies as one as well. *Id.* at 544–46 (explaining that both Ohio statutes "require[] violent force . . . [or] force capable of inflicting pain or injury" given both share the phrase "physical harm"). Our continued reliance on that part of *Evans* in *Johnson* demonstrates that *Havis* abrogated only part of *Evans*. The part of *Evans* that remains good law—its analysis and decision that Ohio Rev. Code § 2903.13(A) qualifies as a crime of violence—requires us to find Raymore's assault conviction under the same state statute is a crime of violence.

Raymore also argues that *Burris* and *Havis* require us to find his aggravated robbery conviction under Ohio Rev. Code § 2911.01(A)(1) does not satisfy § 4B1.2(a)(1). He specifically argues that Ohio aggravated burglary does not qualify as a crime of violence because this circuit "recently held [that] attempt crimes cannot qualify as crimes of violence under § 4B1.2's elements clause." (Appellant's Br. at 33 (citing *Havis*).) He also claims that a conviction for Ohio aggravated robbery "does not require the use of force." (*Id.* (citing *Burris*).)

We find no merit in Raymore's arguments. He again misinterprets our decision in *Havis*. We also found in *Patterson* that a conviction for aggravated robbery under Ohio Rev. Code § 2911.01(A)(1) "requires proof that the defendant . . . 'use[d], attempted [to] use, or threatened [to] use [] physical force against the person of another.'" 853 F.3d at 302–03 (quoting *State v. Evans*, 911 N.E.2d 899, 895 (Ohio 2009); 18 U.S.C. § 924(e)(2)(B)(i)). Based on that conclusion and using the categorical approach, we found Ohio Rev. Code § 2911.01(A)(1) "qualifies as a violent felony under the elements clause" of the ACCA. *Id.* at 302–05. And

given that determination, the *Patterson* panel "conclude[d] that aggravated robbery" under that same Ohio provision "qualifies as a crime of violence under the Guidelines" as well. *Id.* at 305 ("We have not hesitated to use authority interpreting the elements clause in the Armed Career Criminal Act in interpreting the same phrase in the Guidelines."). Our en banc decision in *Burris* did not affect our earlier decision in *Patterson*. In fact, after *Burris*, we continued to cite and apply *Patterson* as good law. *See Johnson*, 933 F.3d 540 (explaining that we "held" in *Patterson* "that an Ohio conviction for aggravated robbery under" Ohio Rev. Code § 2911.01(A)(1) "qualifies as an ACCA crime of violence" and that we also use that authority to interpret § 4B1.2(a)(1)).

Our precedent controls. The sentencing court appropriately enhanced the Guidelines range for Raymore's sentence after correctly finding that Raymore's prior Ohio assault and aggravated robbery convictions qualified as § 4B1.2 crimes of violence.

**III.**

For Gregory Raymore, the timing between his conviction and the Supreme Court's later decision affected his present appeal against his indictment and the court's jury instructions. Unfortunate as that is, it does not change our rejection of those arguments. The other two arguments he makes also fail. So we AFFIRM.

---
**CONCURRENCE**
---

KAREN NELSON MOORE, Circuit Judge, concurring.   I agree with the majority's decision to affirm Gregory Raymore's conviction and sentence.   I write separately because I disagree that a stipulation merely to having been convicted of a felony in the past strongly suggests that the *Rehaif* error in the indictment did not substantially affect the defendant's rights.

Raymore was charged with and convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).   Previously, the Government did not need to prove that the defendant knew that she was a felon at the time of her arrest.   Then, last year, the Supreme Court held in *Rehaif v. United States* that, to convict under §§ 922(g)(1) and 924(a)(2), "the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm."   139 S. Ct. 2191, 2200 (2019).   Thus, the Government now must show that the defendant knew, at the time of arrest, that she previously had been convicted of a felony.   *See United States v. Hobbs*, 953 F.3d 853, 856 (6th Cir. 2020).

As the majority recognizes, Raymore's indictment, which predated *Rehaif*, failed to allege that Raymore had knowledge of his status as a felon at the time of his arrest.   Because Raymore did not object to the indictment in the district court, we must review his challenge to the indictment on appeal for plain error.   *United States v. Howard*, 947 F.3d 936, 942–43 (6th Cir. 2020); *Henderson v. United States*, 568 U.S. 266, 273–74 (2013).   On plain error review, we will remand for a new trial only if:

> (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings."

*Howard*, 947 F.3d at 943 (original alterations omitted) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)).

Raymore's indictment clearly violates *Rehaif*, so the critical question is whether the error affected his substantial rights. I agree with the majority that the error did not affect Raymore's substantial rights, but only because Raymore previously had been convicted of being a felon in possession of a firearm. The fact that one of Raymore's prior convictions was based on his status as a felon almost certainly would establish that Raymore knew, at the time of his arrest in this case, that he was a convicted felon. I would not, however, treat Raymore's stipulation to having been convicted of a felony previously as "strongly suggestive" of knowledge of his status as a felon.

Raymore stipulated to the following at trial: "I, Gregory Raymore, Defendant in Case Number 19CR81, hereby stipulate that I was convicted of a crime punishable under the laws of the State of Ohio by a term of imprisonment exceeding one year." R. 61 (Trial Tr. vol. 4 at 588) (Page ID #847). He did not stipulate to *knowing* at the time of the offense that he had been convicted of a felony. A stipulation like this reasonably may factor into the court's analysis of the record in deciding whether the *Rehaif* error in the indictment affected the defendant's substantial rights, but it is not "strongly suggestive" of knowledge of status as a felon. The only fact that this stipulation *strongly* suggests is that Raymore knew that he was a felon at the time of trial—not at the time of arrest.

I recognize that we already have stated in a published decision that, "[a]lthough the stipulation of a prior felony does not automatically establish knowledge of felony status, it is strongly suggestive of it." *United States v. Ward*, 957 F.3d 691, 695 (6th Cir. 2020) (quoting *United States v. Conley*, 802 F. App'x 919, 923, (6th Cir. 2020)). The Ninth Circuit seems to agree. *See United States v. Benamor*, 937 F.3d 1182, 1188–89 (9th Cir. 2019) (reasoning that the stipulation to having been convicted of a felony satisfies *Rehaif*, but offering a contingency analysis).

No other circuit to consider this question, however, has used a stipulation like Raymore's as a thumb on the scale for finding that the error in the indictment did not affect the defendant's substantial rights. *See United States v. Miller*, 954 F.3d 551, 559 (2d Cir. 2020) (rejecting the Government's argument that the defendant's stipulation to having been convicted previously of a felony constituted enough evidence to rule that the error did not affect the defendant's substantial

rights); *United States v. Huntsberry*, 956 F.3d 270, 283 (5th Cir. 2020) (stating that it was a "close question" whether the defendant's stipulation to having been convicted previously of a felony was sufficient evidence of knowledge of status); *United States v. Maez*, 960 F.3d 949, 967 (7th Cir. 2020) (holding that the defendant's stipulation to having been convicted previously of a felony, "combined with the evidence of his evasive behavior at the time of the search, was sufficient to permit that inference of his knowledge"); *United States v. Hollingshed*, 940 F.3d 410, 415 (8th Cir. 2019) (assuming that the defendant's stipulation to having been convicted previously of a felony "does not resolve the issue of whether he knew he was a felon" at the time of arrest); *United States v. Reed*, 941 F.3d 1018, 1020–22 (11th Cir. 2019) (considering the defendant's commission of eight felonies, his stipulation to having been convicted previously of a felony, his testimony that he knew he was not supposed to have a gun, and his admission to having served at least eighteen years in prison on a prior drug conviction, in deciding that the error in the indictment did not affect the defendant's substantial rights); *United States v. Moore*, 954 F.3d 1322, 1337–38 (11th Cir. 2020) (considering that the defendants previously served lengthy sentences for felony convictions—including, "[m]ore notably," for being felons in possession of a firearm—and their stipulations to having been convicted previously of felonies, in deciding that the error in the indictments did not affect the defendants' substantial rights).

Most recently, the Seventh Circuit expressly decided not to "go quite so far" as we did in *Ward*, "as to hold that an *Old Chief* stipulation [to having been convicted previously of a felony] standing alone is sufficient to infer, beyond a reasonable doubt, a defendant's knowledge of his status as a felon at the time of the charged possession of the firearm." *Maez*, 960 F.3d at 967 (citing *Ward*, 957 F.3d at 696).

The weight that we afford to a stipulation like Raymore's will not make a difference in his case, or even in most other cases. Often there is additional evidence, like there is here, that the defendant knew that she was a felon. Nevertheless, it is our duty to give *Rehaif* real effect for those to whom it matters. If we do not correct our approach, *Rehaif* soon may be dead in the water in our circuit for the small class of defendants it was designed to protect—those who genuinely did not know that they were a felon at the time of arrest. And going forward, it will be

enough for defendants to stipulate to *knowledge* of their status as a felon.[1]  The recommendation that I make, therefore, is a limited walk-back, with limited impact.  That should give this court all the more reason to back down from its line in *Ward* before it is rightfully challenged.

---

[1]Because defendants can make a stipulation as to knowledge of status, there is no reason to believe that the Government will be able to circumvent *Old Chief v. United States* and introduce facts from prior convictions to defendants' prejudice.  *See* 519 U.S. 172, 191 (1997).