**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0720n.06

**No. 19-5753**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 29, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| JAMAR GARRISON, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:     BOGGS, STRANCH, and THAPAR, Circuit Judges

BOGGS, Circuit Judge.  This case arises out of a traffic stop of a rented truck that revealed a pistol and thirteen individual baggies of controlled substances hidden away.  Garrison, the sole occupant, was convicted of possession of a firearm by a prohibited person, possession of heroin with intent to distribute, and possession of a firearm in furtherance of a drug-trafficking crime—violating 18 U.S.C. § 922(g)(1), 21 U.S.C. § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 924(c)(1)(A) respectively.  He was sentenced, with an Armed Career Criminal enhancement under 18 U.S.C. § 924(a)(2) and (e), to the statutory minimum of fifteen years in prison for Count 1, a concurrent fifteen years for Count 2, and a consecutive five years as the statutory minimum for Count 3.  His aggregate sentence was twenty years of imprisonment with six years of supervised release.

Garrison brings this appeal asserting deficiencies in both the trial and sentence.  He claims: The Government suppressed two documents in violation of its obligations under *Brady v. Maryland* and Federal Rule of Criminal Procedure 16; the district court abused its discretion by

limiting cross-examination of a witness; the Government knowingly presented false testimony; the indictment and jury instructions were flawed; and his sentence was procedurally unreasonable.

The most plausible allegation that would warrant a new trial is that the Government committed a *Brady* violation through its belated disclosure of a fingerprint report showing that no identifiable prints were found on the gun. Whether intentional or not, withholding the report during pretrial discovery was inappropriate, but it does not warrant a new trial. Because none of Garrison's claims demonstrate a reversable error in the trial, we affirm his conviction and sentence in full.

## I. BACKGROUND

### A. The Arrest

On the night of December 29, 2017, Louisville Metro Police (LMP) officers pulled over Garrison while he was driving a rental pickup truck in downtown Louisville. He did not signal while changing lanes and drove by another unmarked police car, "nearly clipping [its] windows," so the police officers activated their lights and sirens. The car slowly came to a stop. Three officers approached the truck with suspicion because of its dark-tinted windows and the "abnormally long" time it took to roll to a stop. From experience, they knew that slow stops and dark windows often came hand-in-hand with drugs.

One officer approached the driver's window and asked Garrison if he knew why he was stopped and if there were any guns or drugs in the truck. Garrison responded and produced a baggie of marijuana. The officer told him to get out of the truck. As Garrison exited, a "corner baggy"—similar to those used to transport small quantities of drugs—with the remnants of an unknown substance fell to the ground.

After Garrison moved to the back of the truck, another LMP officer patted him down and found two bundles of cash totaling $3,397 and a bottle that appeared to contain codeine. Then, two police officers began to search the truck while Garrison watched. Even as other officers tried to speak to him, he kept turning to observe the vehicle search. Despite the cold weather, Garrison was "sweating profusely" as he continued to watch the officers closely, particularly when they neared the driver's side door. Inside the truck, the officers observed "tooling marks" on the driver's side door and found a screwdriver in the cabin.

Another officer in a narcotics mobile canine unit heard of the event on the radio and came to the scene as support. After being informed that a small quantity of drugs was found on Garrison, he directed his dog to search the truck. The narcotics officer similarly observed Garrison's physical signs of nervousness as well as the screwdriver and tooling marks on the driver's side door control panel. The dog alerted to the door, and an officer removed the control panel. In the empty space below, he found a pistol and thirteen individually knotted baggies containing substances that turned out to be heroin, fentanyl, and cocaine.

Garrison's arrest and the search of the pickup were captured in the arresting officers' bodycam videos. The police took pictures of the vehicle, gun, and drugs. They also sent the pistol to be tested for functionality and fingerprints, and the narcotics to a chemical lab.

Later that night, when Garrison was in jail, he made a phone call. The recorded call expressed his disbelief that the police were able to search inside the driver's side door and that he didn't know they could do that.

## B. The Trial

Federal authorities took over the state investigation and indicted Garrison on May 23, 2018. The Government charged him with three counts: Count 1, possession of a firearm by a prohibited

person, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), 924(e); Count 2, possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); and Count 3, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

At Garrison's arraignment, the district court ordered the prosecutor to provide pretrial discovery and inspection for "all matter subject to disclosure under Federal Rule of Criminal Procedure 16" upon Garrison's request. The order expressly mentioned *Brady*, *Giglio*, and Jencks Act material that was discoverable under Rule 16(a)(1). Garrison filed a pretrial motion for disclosure of exculpatory and impeaching information pursuant to Rule 16(a)(1) and *Brady*, requesting seven types of material. *See Brady v. Maryland*, 373 U.S. 83 (1963). The court granted only the request for the seventh category, related to "[a]ny and all physical evidence, including but not limited to records and photos."

The trial began on July 24, 2018, and lasted three days. The Government's case consisted of testimony and bodycam footage from the officers involved in the arrest. The testimony was accompanied by videos and pictures from that night. The Government also introduced Garrison's recorded call from jail where he expressed his shock that officers could search inside the panel of the door.

On the second day of the trial, Garrison asked Detective Crawford—one of the police officers who conducted the arrest—if "the government has ever attempted to fingerprint the firearm." He responded, "I believe they did, sir." Garrison continued his line of questions but later, during a recess, raised before the judge the Government's failure to disclose a fingerprint report. The Government responded that it did not believe there was one. During the lunch break, the Government located the report and turned it over. The test showed a "negative result," which

means no identifiable prints were found on the gun. The court offered to let Garrison recall the last witness for further questioning.

Garrison did not recall Det. Crawford, but Special Agent Hicks discussed the report and its significance more extensively during his testimony. Agent Hicks—the Bureau of Alcohol, Tobacco, and Firearms case agent responsible for the investigation—explained that it was common for fingerprint tests to produce negative results and that the report did not rule out anyone from having held the weapon. Garrison asked him about the report on cross-examination.

The Government also called Det. McKinney, who described his experience as a narcotics investigator for LMP. Det. McKinney did not have knowledge of Garrison's case, but testified to common practices of drug dealers and addicts. He testified that dealers often drive vehicles rented in the name of others, with dark-tinted windows, and carry weapons. This practice has the benefit of not alerting authorities if the police run the plates, even if the driver has a record. Det. McKinney also stated it was common for dealers to carry a small bag of drugs on their person while keeping the rest hidden in a stash to avoid detection. Yet, unlike dealers, it would be very unlikely for an addict to have more than a day's worth of heroin because the temptation would be to use it.

Two witnesses testified to renting the pickup truck at issue. Only one, Phillip White, said he drove the vehicle at all, and that was only briefly after picking it up from the rental lot. Outside of the initial rental by White, neither he nor Patrick Bullington admitted to driving the vehicle at all, and there is no evidence suggesting otherwise. White initially rented the truck at Garrison's request on December 4, 2017, but asked Garrison to get it out of his name after a dispute.

On December 21, Garrison asked Bullington to rent the vehicle in Bullington's name in exchange for half a gram of heroin. This date was corroborated by a rental receipt and reference

to a number of phone calls between Garrison and Bullington on that day. Bullington stated that Garrison had given him money and instructed him to get money orders and bring them to the rental agency, where he filled out forms. Bullington never drove the truck and said he was only in it on the occasions he met with Garrison. Bullington further explained that he was addicted to pain pills and heroin and rented the truck in exchange for narcotics.

On cross-examination, Garrison questioned Bullington about his criminal record and addiction. Bullington was not sure about all the details of his criminal record but said that he believed he was charged with a felony and later that he thought it was a "theft charge." The Government objected that questions regarding his prior convictions were an improper impeachment method. Garrison argued that questions about the convictions were proper because they were crimes of moral turpitude. He argued they specifically went to credibility because Bullington said he paid for his drug habit from his own money, and from borrowed money, not from stealing from cars. The court ruled that Garrison could not question Bullington further on this topic because how Bullington paid for heroin was "a side tangent." In addition, Bullington had already said he had a theft charge and there was no need to "go any further down that rabbit hole."[1]

Three statements from Bullington's testimony are relevant on appeal. First, he stated that he rented the truck "around Christmas" and, after being shown the rental receipt, he clarified it was actually December 21, 2017. Second, he said he received $300 to $400 from Garrison to rent the truck. Third, on direct, Bullington said he contacted Garrison at a phone number ending in

---

[1] Garrison had also mentioned in his opening statement that Bullington was facing charges for breaking into a vehicle.

0398 after seeing call logs, and on cross-examination he said he gave the agents who interviewed him the "same information that [he had] given . . . today."

These statements are relevant because they are arguably inconsistent with aspects of Det. Walker's summary report (the "Walker report") and Agent Hicks's handwritten notes of Bullington's interview in April 2018. Det. Walker was the LMP investigator assigned to the case. The Walker report contains a typed summary of the conversation and states that Bullington described the rental as occurring in "late October," that he received $300 for the rental, and that there were three phone numbers for Garrison, including one ending in 0398. Agent Hicks's handwritten notes contained bullet-pointed incomplete sentences stating facts, including that Bullington rented the truck "at end of last year Octoberish," that he received "$300 cash." The notes also contained one phone number for Garrison and multiple numbers for others, but none of them ended in 0398.

Neither of these documents was produced during discovery or before Bullington's testimony. The Government asserted that the Walker report was not Jencks Act material as to Bullington, and the district court came to the same conclusion after reviewing it in camera. Garrison did not receive a copy of the Walker report until it was used to refresh Agent Hicks's recollection during his direct examination, and he did not receive the handwritten notes until the end of Hicks's direct testimony. The district court determined there was no need to turn the documents over sooner as impeachment material because they were not materially inconsistent with Bullington's statement. Garrison had a copy of both reports before Agent Hicks's cross-examination but did not ask any questions about his interview with Bullington.

Garrison's theory of the case was that the Government did not conduct a thorough investigation and there were "two likely suspects." In his opening statement, he discussed

Bullington's criminal record and suggested that, because the truck was in Bullington's name, the gun could have belonged to either Bullington or Garrison. Garrison explained:

> Now, the government could have solved this for you pretty simply in the beginning. They could have fingerprinted the baggies of dope, they could have fingerprinted the gun, they could have fingerprinted the screwdriver they say was used to pop open the panel but they didn't. They didn't even try.
>
> Yeah, baggies might be hard to fingerprint, but that shiny metal on a gun or a magazine or bullets or a screwdriver they didn't even try to fingerprint, and that -- I think that would have solved the issue from the get-go.
>
> . . .
>
> So staged photographs, hidden witnesses, lack of fingerprint evidence, and two likely suspects create reasonable doubt in this case.[2]

During his closing, Garrison returned to the theme that Bullington was an untrustworthy "junkie" on felony bond and that, because his name was on the rental agreement, he was a plausible suspect who could have "crossed state lines to buy heroin [and] hid heroin and a gun in a car he rented."

The jury convicted Garrison on all three counts after about an hour of deliberation. The court referred to a stipulation during jury instructions related to the Government's burden of proof for possession of a firearm by a prohibited person. The stipulation stated: "Prior to December 29, 2017, Defendant Jamar Garrison had been convicted in a court of a crime punishable by imprisonment for a term exceeding one year. That is a felony offense. The parties do not dispute this fact."

During the sentencing hearing, the court determined that Garrison's Guidelines range was thirty years to life, based on a total offense level of thirty-seven and a criminal history category of VI—based on twenty-seven other felony convictions. The district court discussed the statutory

---

[2] We assume "staged photographs" is a reference to the crime-scene photos of the gun and narcotics taken after they were removed from the door panel, and "hidden witnesses" refers to the fact that Garrison was not informed of all the witnesses testifying against him until the day of the trial.

minimum of twenty years for the combined offenses as well as the quantity of drugs and need for deterrence. Under the Armed Career Criminal enhancement, there was a fifteen-year minimum for possession of a firearm by a felon and a five-year minimum for use of a firearm in furtherance of a drug-trafficking crime—under Counts 1 and 3 respectively. At Garrison's request, the court sentenced him to fifteen years for Count 2, to be served concurrently with the sentence for Count 1, effectively adding no additional time to the total sentence. The aggregate sentence was twenty years imprisonment, the lowest permissible amount of confinement.

## II. ANALYSIS

### A. *Brady* Violation

#### 1. Standard of Review

Whether conduct amounts to a *Brady* violation is a question of law that we review de novo. *United States v. Tavera*, 719 F.3d 705, 710 (6th Cir. 2013). Withholding *Brady* evidence, which is evidence that is favorable to a defendant and material to either guilt or punishment, violates due process and requires that we grant a new trial. *Brady*, 373 U.S. at 87.

#### 2. Brady *Framework*

A defendant must prove three elements to show a *Brady* violation. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Ibid*. The third inquiry is also described as a "materiality" requirement because evidence must be material for its suppression to prejudice the defendant. *See Brooks v. Tennessee*, 626 F.3d 878, 890–92 (6th Cir. 2010) (citing *Strickler*, 527 U.S. at 282).

The first element, favorability, "asks only which party the evidence favors." *Clark v. Warden*, 934 F.3d 483, 492 (6th Cir. 2019). Evidence favors a defendant if it is exculpatory or can be used to impeach a government witness. *Strickler*, 527 U.S. at 281–82. There is reason to think the threshold for favorability should be fairly low; most cases only discuss the issue glancingly, usually because the allegations make it obvious or a given.

The second element, suppression, is met whenever evidence is withheld from the defendant "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The prosecutor has a duty to learn of favorable evidence known to others acting on the government's behalf, including the police. *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995).

The third element, prejudice or materiality, requires that there be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. This inquiry is not a sufficiency-of-the-evidence test, and it does not require a finding that it is "more likely than not" that the conviction or sentence would be different, only that the likelihood of a different result is great enough to "undermine[] confidence in the outcome of the trial." *Id.* at 434–35 (quoting *Bagley*, 473 U.S. at 678).

In instances of delayed disclosure, rather than complete suppression, *Brady* generally does not apply unless the delay itself causes prejudice. *United States v. Bencs*, 28 F.3d 555, 560–61 (6th Cir. 1994). Late disclosures that contradict previous statements are not necessarily material to a trial's outcome. *See, e.g.*, *United States v. Baker*, 562 F. App'x 447, 453–54 (6th Cir. 2014)

(finding the delayed disclosure that the government had conducted a trace on a weapon, despite a prior defense statement asserting otherwise, was not material). To show that a delay was material to the outcome, "a defendant must show what he would have done differently had he been given more time to address the *Brady* evidence"—specifically, how the evidence being disclosed earlier would have created the reasonable probability of a different result. *United States v. Fields*, 763 F.3d 443, 459 (6th Cir. 2014) (quoting *United States v. Spry*, 238 F. App'x 142, 148 (6th Cir. 2007)).

Garrison asserts that the Government committed a *Brady* violation through its suppression of the negative fingerprint report and the Walker report. With the above framework, we now turn to these two alleged violations.

### 3. *Fingerprint Report*

Garrison alleges that the fingerprint report's statement that there were no recoverable prints on the weapon in the truck should have been disclosed in discovery and that its suppression until the second day of the trial was a *Brady* violation. Although the report was favorable and suppressed, it was not material to the outcome.

The negative fingerprint report was favorable to Garrison. It is common that fingerprint tests do not provide identifiable prints and a lack of prints does not necessarily mean Garrison didn't handle the gun. But these facts go to the strength of the evidence, not to whom it favors.

The report was suppressed. It is the Government's duty to learn of favorable evidence in the possession of the police, and it failed to do so until a witness mentioned the existence of the report in court.

The delayed disclosure of the report was not material. At no point did the Government argue that Garrison's prints were on the items hidden in the truck, and it presented overwhelming

evidence that he knowingly possessed them. Also, Garrison had a full opportunity to cross-examine witnesses and even recall others to ask questions about the report and highlight the lack of fingerprints to the jury after the report was disclosed.

Garrison argues the delayed disclosure "irreparably gutted half" of his defense, yet he fails to show how the belated disclosure of the report did more than contradict one sentence of his opening statement. Appellant Br. at 25. His argument below was that the Government could have solved the case from the beginning by fingerprinting the gun, screwdriver, and baggies but "[t]hey didn't even try." He concluded by stating: "So staged photographs, hidden witnesses, lack of fingerprint evidence, and two likely suspects create reasonable doubt in this case." A negative report does not contradict the essence of his theory that there was a "lack of fingerprint evidence" and that there were two people who could have put the drugs and gun in the door panel.

Garrison fails to show what he would have done differently that could undermine our confidence in the outcome. It is not reasonably probable that the jury would have been persuaded by a slightly different opening statement despite the bodycam footage and testimony of multiple officers, a recorded phone call, and expert-witness testimony. Simply refuting a prior suggestion to the jury is not necessarily enough to make evidence material and create doubt regarding the verdict. *See, e.g.*, *Baker*, 562 F. App'x at 453–54. The delay was not material. Therefore, the suppression did not amount to a *Brady* violation.

### 4. The Walker Report

Garrison similarly argues that withholding Det. Walker's interview-summary report until Agent Hicks's testimony was a *Brady* violation because it was suppressed and contained contradictions that could have been used to impeach Bullington. Yet the delayed disclosure was not material and the report was not discoverable, *see infra* Section II.B.4, and the inconsistencies

addressed only minor and uncontested aspects of Bullington's testimony. Bullington—despite Garrison's assertions otherwise—was neither the Government's star witness nor the only connection to the truck. Appellant Br. at 34.

The Walker report was favorable to Garrison because it contained information that could be used to impeach Bullington about the date he rented the truck in which Garrison was later stopped. The prosecution also withheld the report until Agent Hicks's direct examination.

Det. Walker's report's "late" disclosure was not material because it does not undermine confidence in the trial's outcome. The report's impeachment value was slight. It did not strongly diminish Bullington's credibility nor contradict a contested aspect of the case. The report could have been used to impeach Bullington because of an inconsistent statement regarding the date he rented the truck, but the actual date was corroborated by a signed receipt and was not an important aspect of the case.

There are no other direct contradictions. The Walker report states that Bullington said he received $300 from Garrison. At trial, he testified it was "like between [$]300 and $400." Hardly inconsistent. And Garrison points out that the Walker report provides three phone numbers for Garrison while Agent Hicks's handwritten notes only list one next to his name. Yet Bullington testified to Garrison's phone number after his memory was refreshed by images of text messages between the two. The fact that one notetaker did not write down a phone number does not necessarily make the other's report *Brady* material when it is consistent with trial testimony.

The Walker report is not *Brady* material and the Government produced it at the proper time.

## B. Jencks Act Material & Discovery

### 1. *Standard of Review*

We examine a district court's ruling regarding the production of Jencks Act material for clear error. *United States v. Nathan*, 816 F.2d 230, 237 (6th Cir. 1987). Rulings on discovery violations under Federal Rule of Criminal Procedure 16 are evaluated for an abuse of discretion. *United States v. Richards*, 659 F.3d 527, 543 (6th Cir. 2011). "An abuse of discretion occurs when a district court (1) relies on clearly erroneous factual findings, (2) improperly applies the law, or (3) uses an erroneous legal standard." *United States v. Paulus*, 894 F.3d 267, 279 (6th Cir. 2018). If an error occurred, we "apply Rule 52(a)'s harmless-error analysis." *Neder v. United States*, 527 U.S. 1, 7 (1999); Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). "An error, not of constitutional dimension, is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Neuroth*, 809 F.2d 339, 342 (6th Cir. 1987).

### 2. *Jencks Act Material*

The Jencks Act, 18 U.S.C. § 3500, requires that, upon a defendant's request, the government provide him with prior statements of testifying government witnesses that relate to their testimony. *United States v. Padin*, 787 F.2d 1071, 1077 (6th Cir. 1986) (citing 18 U.S.C. § 3500(b)). The Act specifically defines "statement":

> (e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement . . . .

18 U.S.C. § 3500(e).

"The Jencks Act was enacted in response to a fear that the Supreme Court's decision in [*Jencks v. United States*, 353 U.S. 657 (1957),] would be interpreted to 'compel the undiscriminating production of agents' summaries of interviews regardless of their character or completeness.'" *Padin*, 787 F.2d at 1077 (quoting *Palermo v. United States*, 360 U.S. 343, 350 (1957)). Reports written by government agents summarizing prior witness statements do not qualify as Jencks Act material unless they are "signed or otherwise adopted or approved by [the witness]." *Id.* at 1078 (quoting 18 U.S.C. § 3500(e)(1)). Agent notes are not transformed into Jencks Act material at trial just because the author testifies that they are accurate summaries or because they are used to refresh his recollection. *See Nathan*, 816 F.2d at 237.

The Walker report and Agent Hicks's handwritten notes are not Jencks Act material as to Bullington because they summarize the interview with Bullington (incompletely, in Hicks's notes) and Bullington did not sign or otherwise adopt or approve them. Instead, they are the type of document that the Jencks Act was passed specifically to protect from discovery. Therefore, the district court did not err in its determination the documents did not need to be produced.

### 3. Rule 16

Rule 16 provides that, upon a defendant's request, the government must allow defendants to copy reports from any scientific test. The relevant provision states:

> **(F) Reports of Examinations and Tests**. Upon a defendant's request, the government must permit a defendant to inspect and to copy or photograph the results or reports of any physical or mental examination and of any scientific test or experiment if:
> (i)   the item is within the government's possession, custody, or control;
> (ii)  the attorney for the government knows--or through due diligence could know--that the item exists; and
> (iii) the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial.

Fed. R. Crim. P. 16(a)(1)(F). Rule 16 does not require disclosure of material not referred to in its express provisions. *United States v. Presser*, 844 F.2d 1275, 1285 (6th Cir. 1988). Fingerprint comparisons do fall under this provision. Fed. R. Crim. P. 16 advisory committee's note to 1966 amendment.

The underlying purpose of criminal discovery rules is "[p]reserving the defendant's ability to defend himself effectively at trial." *Presser*, 844 F.2d at 1283–84. A defendant can be prejudiced under Rule 16 through delay that causes undue surprise, resulting in a lack of an adequate opportunity to prepare a defense. *See United States v. De La Rosa*, 196 F.3d 712, 716 (7th Cir. 1999). But a district court has broad discretion regarding remedies to any prejudice that ensued. Fed. R. Crim. P. 16(d); *see also United States v. Clark*, 385 F.3d 609, 621 (6th Cir. 2004).

Prior to Garrison's trial, the district court ordered the Government to "permit inspection and copying or photographing of all matter subject to disclosure under Federal Rule of Criminal Procedure 16." This was followed by a Rule 16(a)(1) motion by Garrison for disclosure of exculpatory and impeaching information. The motion was granted in respect to "[a]ny and all physical evidence, including but not limited to records and photos."

The Walker report falls under neither one of the express provisions of Rule 16 nor the district court's order. Therefore, the Government provided it to Garrison at the proper time when it was used to refresh the memory of a witness.

The fingerprint report does fall under Rule 16(a)(1) and should have been produced. While the report may not have been material to the outcome of the trial, as would be required to establish a *Brady* violation, it was material to preparing a defense. *See United States v. Agurs*, 427 U.S. 97, 109–10 (1976) (distinguishing between information that could help the defense and that which establishes "materiality" in the constitutional sense). Fingerprint test results—negative, positive,

or nonexistent—will always be material to preparing a defense in a gun-possession case, even if at the end of the day they were not material to the verdict because of other factors. *See* Fed. R. Crim. P. 16(a)(1)(F).

By withholding the fingerprint report, the Government failed to comply with its Rule 16 obligations, but it was within the district court's discretion to provide a remedy or not order one at all. Fed. R. Crim. P. 16(d) ("If a party fails to comply with this rule, the court *may* . . . enter *any* other order that is just under the circumstances.") (emphasis added). Because the report came to light at trial, Garrison was able to cross-examine a Government witness regarding its contents, and the court permitted him to recall Det. Crawford to question him about the report. The district court did not abuse its discretion through its proposed remedy.

### C. Witness Cross-Examination

#### 1. *Standard of Review*

We review a district court's decision to limit the scope of cross-examination for an abuse of discretion. *United States v. Howard*, 621 F.3d 433, 456 (6th Cir. 2002). "A criminal defendant has the constitutional right 'to confront the witnesses against him,' but 'this right is not absolute.'" *Ibid.* (quoting *United States v. Davis*, 430 F.3d 345, 360 (6th Cir. 2005)).

#### 2. *Rule 608*

Federal Rule of Evidence 608(b)(1) allows for a witness's character for truthfulness to "be attacked on cross-examination through questioning on specific instances of conduct relevant to credibility." *United States v. Holden,* 557 F.3d 698, 703 (6th Cir. 2009). The court may allow inquiries into instances of prior conduct when they are probative of truthfulness or untruthfulness. *See* Fed. R. Evid. 608(b). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about,

among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (noting that the defendant must have "an *opportunity* for effective cross-examination," not cross-examination in whatever form she chooses). "No matter how central [a witness's] credibility is to a case[,] . . . the Constitution does not *require* that a defendant be given the opportunity to wage a general attack on credibility by pointing to individual instances of past conduct." *Boggs v. Collins*, 226 F.3d 728, 740 (6th Cir. 2000).

On cross-examination, Garrison called Bullington's credibility into question through references to his past criminal conduct and theft charge. The district court was within its discretion to limit further attacks on the same topic. The court correctly noted that the specifics of how Bullington financed his heroin addiction were "a side tangent" and that Bullington had already admitted to a theft charge. The questions were meant to suggest that because Bullington had stolen from people to buy drugs, "he would be less likely than the average trustworthy citizen to be truthful in his testimony." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). There is no constitutional requirement to allow a general attack on credibility and this is not an instance of mandatory admission of prior convictions. [3] It was entirely within the district court's wide latitude to limit further questioning regarding specific instances of Bullington's prior misconduct and theft because additional questions would only be marginally relevant.

---

[3] Federal Rule of Evidence 609(a)(2) "limits the discretion of the court by mandating the admission of crimes involving dishonesty or false statements." *United States v. Morrow*, 977 F.2d 222, 228 (6th Cir. 1992) (en banc). This rule is not implicated here because we have repeatedly held that misdemeanor theft crimes are not crimes of dishonesty unless there is evidence in the record that they involve a dishonest act or false statement. *See, e.g.*, *United States v. Washington*, 702 F.3d 886, 892–93 (6th Cir. 2012); *United States v. Martin*, 526 F. App'x 643, 647 (6th Cir. 2013).

**D. False Testimony**

*1. Standard of Review*

Typically, the knowing presentation of false testimony is considered a denial of due process, and such a claim is reviewed de novo. *See United States v. Gravley*, 587 F. App'x 899, 916–17 (6th Cir. 2014). But when a claim is not raised at trial, we review it for plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993); Fed. R. Crim. P. 52(b).

*2. Knowing Presentation of False Testimony*

For a due-process violation to result from the prosecution presenting, or not correcting, false testimony, a defendant must demonstrate that: "(1) [T]he statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009) (citing *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998)). The statements must be "indisputably false," and "mere inconsistencies" are not sufficient. *Monea v. United States*, 914 F.3d 414, 421 (6th Cir. 2019) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822–23 (6th Cir. 1989)).

Garrison's claim that the Government presented false testimony through Bullington and Agent Hicks is unsupported because he fails to show their statements were false. Garrison points at two instances of "false" testimony: (1) Bullington's statement of Garrison's phone number (ending in 0398) after his memory was refreshed by a printout of his text messages and his later statement that his testimony was the "same information" he gave to the investigating agents, and (2) Agent Hicks's statement that he received Garrison's 0398 number from Bullington. Appellant Br. at 42. The only evidence that these consistent statements are false is that the phone number was not contained in one of the two written recordings of the interview. While inconsistencies between two documents may point towards the fact that testimony *could be* false, such

inconsistencies are a far cry from making the evidence indisputably false.  There is not a sufficient basis to find the Government presented false testimony, and therefore there was no error.

### E.  922(g) Status as a Prohibited Person

#### 1.  Standard of Review

In *Rehaif v. United States*, the Supreme Court held that the government must prove that a person knew he possessed a weapon *and* knew of his prohibited status to convict him under 18 U.S.C. §§ 922(g), 924(a)(2).  139 S. Ct. 2191, 2200 (2019).  Garrison's indictment and jury instructions did not include this element.  Cases decided after a trial but before sentencing apply on direct review.  *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987); *United States v. Conley*, 802 F. App'x 919, 922 (6th Cir. 2020).

We review this claim for plain error because it was not raised at trial.  *United States v. Raymore*, 965 F.3d 475, 485 (6th Cir. 2020). To establish plain error, a defendant must demonstrate that "(1) an error occurred; (2) the error was obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004).  An error affects a defendant's substantial rights if there is a reasonable probability that the outcome of the proceeding would have been different but for the error.  *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016).

#### 2.  Knowledge of Prohibited Status under Rehaif

Section 922(g) requires that "the Government . . . prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm."  *Rehaif*, 139 S. Ct. at 2200.  An indictment must allege all the elements charged to "ensure that an accused is reasonably informed of the charge against him so that he can

prepare a defense." *United States v. Cor-Bon Custom Bullet Co.*, 287 F.3d 576, 580 (6th Cir. 2002). Jury instructions must "adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 356–57 (6th Cir. 2005) (quoting *Roberts v. Galen of Va. Inc.*, 325 F.3d 776, 787 (6th Cir. 2003)). Therefore, both the indictment and jury instructions now must include that a defendant charged under § 922(g) *knew* of his prohibited status.

In the context of *Rehaif* errors, a deficient indictment typically does not affect substantial rights when there is no contemporaneous evidence suggesting that a defendant could not present an adequate defense or was not put on notice of the crime he was charged with committing. *United States v. Ward*, 957 F.3d 691, 694 (6th Cir. 2020). Regarding jury instructions, "where there is clear evidence in the record from which to infer that the defendant knew he was a felon, failure to instruct the jury does not affect the defendant's substantial rights or the fairness or integrity of the proceedings." *Id.* at 695 (collecting cases). A stipulation of a prior felony conviction does not automatically establish knowledge of that status, but it is strongly suggestive of it. *Id.* at 695–96. And where, as here, the record includes "prior convictions for being a felon in possession," it is "near-impossible for him to contest knowledge of his status as a felon in this case." *Raymore*, 965 F.3d at 486.

The absence of the *Rehaif* knowledge requirement in Garrison's district-court proceedings constitutes an obvious error, but it does not amount to an error affecting his substantial rights or the fairness of his trial. At the age of thirty-three, Garrison had twenty-seven felony convictions— including a guilty plea for illegally possessing a firearm as a felon less than three months before his arrest. There is no doubt that Garrison knew he was a convicted felon, and so the deficiency in the indictment and jury instructions did not compromise the fairness and integrity of his trial.

Garrison could adequately prepare a defense and a jury could infer his knowledge of his prior felony. There is no reasonable probability that but for these errors, the outcome would have been different. *See Molina-Martinez*, 136 S. Ct. at 1343. Therefore, there is no reason for reversal on this ground.

### F. Sentencing Discretion

#### 1. Standard of Review

We review a claim that a sentence was not procedurally reasonable for plain error if the district court asked for additional objections and neither the government nor the defendant objected. *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc)). That was the case here.

#### 2. Sentencing Discretion under Dean

A sentencing court is not precluded from considering the mandatory minimum for use of a firearm in furtherance of a crime of violence or drug trafficking crime when calculating an appropriate sentence for the predicate drug offense. *Dean v. United States*, 137 S. Ct. 1170, 1176–78 (2017); *see* 18 U.S.C. § 924(c). In *Dean*, the Supreme Court held that the requirement that a sentence imposed under § 924(c) run consecutively to any sentence for the predicate crime does not require a judge to determine the punishment for that underlying offense in a vacuum. 137 S. Ct. at 1176–78. "[T]he rule in *Dean* is a permissive one: [A]t sentencing on the underlying offense, a district court *may*, but need not, take into consideration the separate mandatory minimum required by § 924(c)." *United States v. Williams*, 737 F. App'x 235, 242 (6th Cir. 2018). That decision reaffirmed the district court's ability to consider the aggregate sentence resulting from each sentencing decision it makes. *United States v. Person*, 769 F. App'x 222, 225 (6th Cir. 2019). When a district court considers the aggregate sentence, an important factor is whether the sentences

ought to run consecutively or concurrently. *Ibid.* (citing USSG §5G1.3(d), comment. (n.4) (describing the goal of choosing a concurrent, partially concurrent, or consecutive sentence as "achiev[ing] a reasonable incremental punishment for the instant offense")).

Garrison claims his below-Guidelines sentence was procedurally unreasonable because the district court failed to consider its authority under *Dean* to further reduce his Count 2 sentence for possession of heroin with intent to deliver. This charge was the predicate offense to the charge of possession of a firearm in furtherance of a drug-trafficking crime. Yet consideration of mandatory minimums is permissive, and no statement from the sentencing hearing suggests that the sentences for the other crimes were not considered. During the hearing, the court expressly discussed the aggregate sentence and confirmed that the absolute statutory minimum for the offenses was twenty years (no matter how structured) before deciding on a sentence of a concurrent fifteen years for Count 2—effectively not adding any additional time to the minimum sentence required by Counts 1 and 3. There was no sentencing error.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM Garrison's conviction and sentence in full.